*Decision will be entered under Rule 50.*

KARL R. MARTIN AND KATHLEEN MARTIN, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 78271. Filed August 24, 1965.

Karl R. Martin, pro se.
*Jack D. Yarbrough,* for the respondent.

DRENNEN, *Judge:* Respondent determined deficiencies in petitioners' income tax and additions to tax under sections 294(d)(1)(A) and 294(d)(2), I.R.C. 1939,[1] as follows:

| Year | Deficiency | | |
|---|---|---|---|
| | Income tax | Additions to tax, I.R.C. 1939 | |
| | | Sec. 294(d)(1)(A) | Sec. 294(d)(2) |
| 1951 | $460.28 | $355.28 | $236.85 |
| 1952 | 18,676.82 | 2,475.86 | 1,650.57 |
| 1953 | 1,680.76 | | |

At the hearing respondent conceded that petitioners are not liable for the additions to tax pursuant to section 294(d)(2) for the years 1951 and 1952. The issues remaining for decision are: (1) Whether petitioners realized long-term capital gain from the sale of the hotel property; (2) whether petitioners' share of the ordinary distributable losses from the trust that sold the hotel property should be reduced because of the nondeductibility of taxes, attorneys' fees, and accountants' fees; (3) whether petitioners are entitled to a deduction for travel and other expenses (erroneously claimed as a "net operating loss" on the return filed) for the year 1952; and (4) whether petitioners are liable for the additions to tax, pursuant to section 294(d)(1)(A), for failure to file estimated tax returns for the years 1951 and 1952.

Other issues raised in the notice of deficiency have either been conceded or have not otherwise been contested, and these adjustments will be reflected in the Rule 50 computation.

### FINDINGS OF FACT

Petitioners Karl R. Martin and Kathleen Martin are husband and wife who resided in Knoxville, Tenn., during the taxable years 1951, 1952, and 1953. For each of the taxable years petitioners filed joint income tax returns with the district director of internal revenue at Nashville, Tenn. Kathleen Martin is involved in this proceeding solely by reason of having filed joint income tax returns with her husband. Karl R. Martin will hereinafter be referred to as petitioner.

On or about May 30, 1951, R. S. Doggett (hereinafter referred to as Doggett) and petitioner obtained an option to purchase on or before

[1] All references to the Code hereinafter are to the Internal Revenue Code of 1939, unless otherwise noted.

noon, August 1, 1951, the Memorial Hotel Building in Nashville, Tenn., for $620,423. The hotel building was located diagonally across the street from the State capitol grounds in Nashville and was in close proximity to many State government office buildings.

Doggett and petitioner did not have the necessary cash to complete the purchase of this property. Doggett approached Stirton Oman, who apparently had participated in other similar joint ventures, because it was believed that Stirton Oman could obtain a larger mortgage for the purpose of purchasing the property. Stirton Oman and his brother, John Oman III, agreed to enter into the transaction and procure the necessary financing and in return they were to receive a one-third interest in the transaction.

Andrew Ewing, a Nashville attorney, was employed to represent the parties in this transaction. Subsequently Andrew Ewing was contacted by E. A. Adams (hereinafter referred to as Adams), who was at that time superintendent of premises and layouts for the Tennessee Department of Employment Security. Negotiations between Adams and Andrew Ewing were opened for the acquisition of the hotel property to be used as office accommodations for the Department of Employment Security. Adams had been informed by the Governor that the Department of Employment Security would have to vacate its offices in the Cotton States Building, where the department was then located.

On or about July 18, 1951,[2] Cumberland Properties, Inc., a Tennessee corporation (hereinafter referred to as the corporation), was formed, and the option was transferred to the corporation. All of the stock of the corporation, 300 shares, was issued to J. Marshall Ewing and Andrew Ewing, the president and secretary-treasurer, respectively, of the corporation as trustees for the following beneficial owners:

| | Number of shares |
|---|---|
| Robert S. Doggett | 100 |
| Karl R. Martin | 100 |
| Stirton Oman | 50 |
| John Oman III | 50 |

Negotiations between the parties continued, and on July 20, 1951, the corporation entered into an agreement entitled "Lease with Option to Purchase" with the State of Tennessee (hereinafter referred to as the State) and Third National Bank in Nashville. This agreement provided for a 15-year lease of the Memorial Hotel property, beginning on January 1, 1952, whereby the State would pay in monthly installments a total of $1,769,040. The agreement (the terms of which are explained in greater detail below) also contained an option whereby the State could purchase the property.

---

[2] Stipulated as June 18, 1951, but corrected by supplemental stipulation. See *post.*

On or about July 31, 1951, the Omans arranged the necessary financing to purchase the hotel building by personally loaning the corporation $18,000 each and by arranging a loan of $600,000 through the Third National Bank of Nashville (hereinafter referred to as the bank) from the First Mortgage Co. of Nashville, Tenn. (This loan was apparently evidenced by a note dated December 19, 1951, from the corporation to First Mortgage Co., secured by a deed of trust on the hotel property of even date therewith from the corporation to the bank as trustee.) Also on or about July 31, 1951, Andrew Ewing, acting for the corporation, exercised the option to purchase the hotel building from the Memorial Corp. On August 17, 1951, the Memorial Hotel Building was conveyed to the corporation.

The "Lease with Option to Purchase" was executed by J. Marshall Ewing and Andrew Ewing, president and secretary-treasurer of the corporation, respectively; by W. R. Jarrell, E. K. Wiley, and Gordon Browning, purchasing agent, commissioner of the Department of Employment Security, and Governor of the State, respectively; and by G. A. Puryear, vice president and trust officer of the bank. The agreement provided the corporation could place a loan on the hotel property for up to $650,000, secured by deed of trust. The lease, for a term of 15 years, was to begin on January 1, 1952, and the State was entitled to all rents due from tenants occupying the premises after commencement of the lease. Rental payments of $9,828 were due every month, and the State was to assume the cost of insuring the premises against loss or destruction. The lease further provided that the State would "indemnify Owner against any and all taxes, rates, assessments and levies," of any kind whatever imposed upon the property, the lease, or the rents paid on or after January 1, 1953. There was a caveat which stipulated that the State was not to reimburse the owner for "any income or succession tax," but the lease did specifically provide that the owner would be indemnified for any special levy against the rents (or installment payments if the option to purchase was exercised) imposed as a substitute for property taxes.

The agreement contained an option to purchase, which could not be exercised by the State prior to July 1, 1952, and the option was to continue for a period of only 6 months. If the option was exercised, the installment payments were to be the same as the rental payments, and prior rental payments were to be credited on the purchase price. The purchase price (in the amount of $1,769,040) was therefore identical with the total rental payments due under the 15-year term of the lease.

The monthly payments (regardless of their classification as *rental payments* under the lease, or *installment payments* under the option to purchase) were to be made directly to the bank, which served as

trustee for the beneficial owners of the property. The agreement concluded with the following provision:

> The said Commissioner of Employment Security and the said Governor, of the State of Tennessee, hereby declare and represent that all conditions required under the provisions of the Acts of the General Assembly of the State of Tennessee of the year 1943, Chapter 89, Section 1, Code Section 3166.1, have been complied with and that this instrument has been executed by them pursuant to the power and authority conferred upon them under the provisions of said statute.

On or about December 28, 1951, the corporation adopted a plan of liquidation which conformed to section 112(b)(7). The corporation was liquidated pursuant to this plan. On or about December 29, 1951, the corporation apparently deeded the hotel property to the bank, as liquidating trustee for the corporation, subject to the lease-option agreement with the State of Tennessee and the deed of trust securing the note to First Mortgage Co.

Also on December 29, 1951, the corporation, J. Marshall Ewing and Andrew Ewing in their capacity as trustees for the beneficial owners of the corporate stock, and the bank, as trustee in liquidation of the corporation, as trustee under the lease-option agreement, and as trustee under the deed of trust securing the note, entered into an agreement which, after reciting all of the steps previously taken in connection with the hotel property, conveyed all of the corporation's remaining assets to the trustee, subject to the beneficial owner's assumption of all the corporation's liabilities except the mortgage, and proceeded to set forth the rights, duties, and interests of the parties, including those of the beneficial owners of the stock of the corporation. Attached to this instrument was an exhibit setting forth the order of disbursements to be made by the trustee of all funds coming into its hands under the terms of the trust agreement and the lease-option agreement. Generally, the order of disbursement was to be as follows:

1. Compensation of trustee.
2. Monthly payments ($3,333.34) on note secured by deed of trust.
3. Other liabilities of corporation, except to Omans.
4. Taxes, with sinking fund provision.
5. Interest on Oman notes.
6. Out of balance to pay Ewing and Talbot $7,500 and Andrew Ewing $13,500, for legal services rendered to beneficial owners of corporate stock.
7. Out of balance to pay four notes of $9,000 each issued by corporation to Omans.
8. Any balance to go to the beneficial owners.

The trustee assumed no responsibility for collection of funds, its function being primarily that of receiving and disbursement agent only.

736

Apparently actual possession of the hotel building was given to the State in the fall of 1951. Extensive renovation was necessary to convert the building from a hotel to an office building that would be suitable for the purpose of the department of employment security. This work was done under the supervision of Adams and apparently was financed through advancements from the Governor's Emergency and Contingency Fund. It further appears from the record that these advancements amounted to $170,000, although the total cost of the improvements amounted to approximately $240,000.[3] At the same time possession was given, the Governor and Adams instituted negotiations with the U.S. Bureau of Employment Security for grant-in-aid monthly rental for quarters in the hotel building, and this was finally approved in April 1952, for $8,699.18 per month. The renovations were completed and the building was occupied by the State on or about January 1, 1952, and the State began making the monthly payments called for in the lease-option agreement.

On or about September 12, 1952, the State notified the trustee that the State was exercising its option to purchase the building. On December 2, 1952, the building was deeded to the State, subject to the mortgage thereon. The State thereafter continued making the monthly payments until October 1953.

The Joint Legislative Investigating Committee of the 1953 Tennessee General Assembly began investigating the real estate transaction in 1953, and as a result of the investigation, a bill was filed in Chancery Court, Part II, Nashville, Tenn., to have the "Lease with Option to Purchase" agreement declared invalid.

On August 26, 1954, the chancellor entered an opinion which declared the agreement invalid and the actions of certain State officials in executing the agreement ultra vires.[4]

The opinion of the chancellor, entered August 26, 1954, provided in part that it was clear under the applicable statutes that it was the legislative intent to restrict State agencies from obligating the State beyond the biennium provided for under appropriation bills. The court decreed that the 15-year lease contract was ultra vires and beyond the authority of the State officials. The court next considered the validity of the purchase after the option to purchase was exercised. The opinion of the chancellor provided in part as follows:

Insofar as the State was concerned it is a fair inference that it intended from the beginning to acquire the hotel property by purchase rather than by lease. * * *

\* \* \* \* \* \* \*

[3] The record does not disclose the source of the remaining $70,000 necessary for this renovation.

[4] In this opinion it is recited that the corporation was formed *July* 18, 1951, and surrendered its charter Dec. 31, 1951.

It is not insisted in the brief filed in behalf of the defendants that said Section 3166.1 of the Code authorized a leasing of land by the State. It is clear that it does not. Said section authorizes the State "to acquire land either by purchase or condemnation for use for public purposes." No mention is made therein of the right to lease. After setting forth certain procedural steps said section then provides that, "Said land shall be paid for out of any available funds in the treasury not otherwise appropriated." The last sentence of said section can mean but one thing to the Court, and that is, that the land, when acquired, must be paid for by the State in cash out of funds not otherwise appropriated. "Available funds" has a very definite meaning to the Court. Certainly it did not mean that the State could buy property on an installment plan, such as was attempted in the case at bar.

\*  \*  \*  \*  \*  \*  \*

The Court has reached the conclusion that the option agreement as consummated was not authorized by statute and like the attempted lease is ultra vires and void.

Cumberland Properties, Inc., filed a corporate income tax return for the year 1951 reporting a net loss of $12,756.16. The balance sheet attached to the return reflected cash in the amount of $3,000 and depreciable assets in the amount of $620,423, or total assets of $623,423. It also reflected liability on a note in the amount of $620,423 and capital stock in the amount of $3,000. It was also indicated that the corporate charter was surrendered December 31, 1951.

Cumberland Properties, Inc., Third National Bank of Nashville, trustee, filed a fiduciary income tax return for the year 1952 to which was attached a schedule reflecting the sale of the Memorial Hotel property to the State of Tennessee. The sales price was stated to be $1,769,040. The basis of the property, including the book value of the property passing to stockholders under section 112(b)(7) at December 31, 1951 ($615,523.93), mortgage loan expense, revenue stamps, etc., was shown to be $624,272.39 of which $1,500 was allocated to furniture and fixtures, leaving a net basis in the real estate of $622,772.39. The profit on the sale of the hotel property was shown to be long-term capital gain on the installment basis in the amount of $1,146,267.61, the percentage of profit to sales price being approximately 64.796 percent. Collections in 1952 were shown to total $117,936 (12 payments of $9,828) of which $76,417.84 was reported as profit. This profit was then allocated one-third to petitioner, one-third to Doggett, and one-sixth to each of the Oman brothers. Short-term capital gain was also reported from the sale of the furniture and fixtures. This return also reflected "Ordinary Expenses for 1952" totaling $58,264.79, including taxes in the amount of $7,329.20 and attorney and accountants' fees in the amount of $21,000, the balance being made up principally of trustee commission and interest on the mortgage and Oman notes. These expenses were also allocated to the beneficial owners of the corporate stock as above indicated.

738

The bank as trustee of Cumberland Properties, Inc., also filed a fiduciary income tax return for the year 1953 reporting collections on the sale of the hotel property in the amount of $93,366, $60,497.46 of which was reported as profit, which was allocated to the individuals mentioned above. The return also reflected ordinary expenses totaling $43,429.98, including $6,101.30 in attorneys' fees, the balance being comprised principally of interest, trustee commissions, and taxes, which expenses were also allocated to the above-named individuals.

Cumberland Properties, Inc., also filed an information return reporting total distributions made to shareholders during the year 1951 reflecting the distribution made on liquidation of the corporation under the provisions of section 112(b) (7). The statement of liquidation reported the book value of the property distributed as of December 31, 1951, to be $623,516.77 but having a fair market value of $853,352.59, from both of which values was deducted mortgage indebtedness assumed in the amount of $600,000 and liabilities assumed in the amount of $33,302.23. The book value of the property distributed to stockholders was shown as a deficit of $9,785.46 and the fair market value was $220,050.36. The statement also reflected an earned surplus deficit of the corporation as of December 31, 1951, in the amount of $12,756.16.

On their joint income tax return for the year 1951, petitioners reported the liquidation of Cumberland Properties, Inc., but showed no income therefrom because the company had no earned surplus and distributed no cash or securities; they also filed a written election to have the liquidation of Cumberland Properties, Inc., qualify under the provisions of section 112(b) (7).

On their joint income tax return for the years 1952 and 1953, petitioners reported their pro rata share of the long-term capital gain on the sale of the hotel property as reflected in the fiduciary returns filed by the trustee, and also claimed as deductions their pro rata share of the "Ordinary Expenses" reported on the fiduciary returns for those years respectively.

In his notice of deficiency respondent determined that the sale of the hotel property resulted in a short-term capital gain rather than long-term capital gain as reported by petitioners and he also determined that the attorney fees and taxes claimed as ordinary expenses by petitioners were not allowable as deductions. The attorney fees were added to petitioners' basis for computing gain on the sale of the hotel property.

On the return filed for the year 1952, petitioners deducted $4,782.60 as a net operating loss. Respondent disallowed this deduction, and in the petition the following allegation appears:

(d) For the year 1952 taxpayers did incur a net operating loss of $4782.60. This loss results from traveling expenses incurred by taxpayers in connection

with various business enterprises with which he was connected and which were not reimbursed.

During the taxable year in question petitioner received income from several corporations, partnerships, and an oil syndicate, all of which was reported on his returns. He traveled to various cities in order to supervise these activities. Petitioner was not reimbursed for these expenses, although he kept records of these expenses. When petitioner's various business enterprises suffered severe financial reverses in later years, the files were placed in the hands of a receiver, and petitioner's records were either lost or destroyed in the process. The only evidence substantiating the actual expenses was a schedule captioned "Reconstructed Expenses Karl R. Martin 1952." The schedule merely listed items in the following manner: "Twenty six trips to Nashville, Tennessee @40.00 $1,040.00." There was no evidence as to the approximate date of any trip, the purpose involved, the corporation or partnership interest that was benefited by the travel, the specific work performed, or the actual expense involved.

OPINION

### Issue 1. Short-Term or Long-Term Capital Gain

The first issue for decision is whether petitioners realized long-term or short-term capital gain on the sale of the hotel property. The critical question is whether the property was held for more than 6 months, because section 117(a)(2)[5] provides that "The term 'short-term capital gain' means gain from the sale or exchange of a capital asset held for not more than 6 months."

In May 1951, petitioner and Doggett secured an option to purchase the hotel for $620,423. They brought the Oman brothers into the transaction to provide the necessary funds and financing. A corporation, Cumberland Properties, Inc., was formed on July 18, 1951, and the option was transferred to the corporation. All the stock of the corporation was issued to Andrew Ewing and J. Marshall Ewing as trustees for petitioner, Doggett, and the Omans. With Andrew Ewing's assistance they secured the State's department of employment security as a potential purchaser of the property. The option was exercised by the corporation and in August 1951 it acquired title to the property. Subsequently, Cumberland Properties was liquidated in December 1951, and the property was transferred to a liquidating trustee for the use and benefit of the beneficial owners of its stock, petitioner, Doggett, and the Omans.

---

[5] SEC. 117. CAPITAL GAINS AND LOSSES.
(a) DEFINITIONS.—As used in this chapter—

&ast;  &ast;  &ast;  &ast;  &ast;  &ast;  &ast;

(2) SHORT-TERM CAPITAL GAIN.—The term "short-term capital gain" means gain from the sale or exchange of a capital asset held for not more than 6 months, if and to the extent such gain is taken into account in computing gross income;

On July 20, 1951, the corporation entered into a lease with option to purchase the property with the State of Tennessee. Under this agreement the State leased the property for 15 years beginning January 1, 1952, for a total rental, over the 15-year term, of $1,769,040. Under the option to purchase, which the State could exercise not earlier than 6 months after the lease began, nor later than 12 months after such date, the State could purchase the property for $1,769,040, payable in monthly installments over the same period and the monthly payments were thereafter to be characterized as installment payments on the purchase price. The option to purchase was exercised by the State in September 1952, and the hotel property was conveyed to the State by deed recorded December 2, 1952.

Both parties tried the case and briefed this issue as though the only critical question was when petitioners' holding period terminated, petitioners claiming that it did not terminate until the State exercised the option to purchase and the property was conveyed to the State on December 2, 1952, thus giving them a holding period in excess of 6 months and a long-term capital gain. Respondent argues that the lease was in reality an installment sale and that petitioners' holding period therefore terminated on January 1, 1952, resulting in a holding period of less than 6 months and thus their profit was taxable as short-term capital gain. Both parties appear to have assumed that petitioners' holding period started either when the corporation exercised the option and acquired the property in August 1951 or when petitioner acquired a beneficial interest in the property upon liquidation of the corporation on December 29, 1951, either of which dates would result in a holding period of less than 6 months if the holding period terminated on January 1, 1952, or in excess of 6 months if the holding period terminated on December 2, 1952. Consequently, we will first decide when petitioners' holding period terminated.

We agree with respondent that petitioners' holding period terminated on the effective date of the lease-option agreement, January 1, 1952, when the State took possession of the property and began making payments under the agreement.

The written agreement itself is in form a lease with option to purchase. But we are not bound by the form of the agreement or the characterization thereof by the parties. *Helvering* v. *Lazarus & Co.*, 308 U.S. 252; *East Coast Equipment Co.*, 21 T.C. 112, affd. 222 F. 2d 676; *Mt. Mansfield Television, Inc.* v. *United States*, 239 F. Supp. 539, affirmed per curiam 342 F. 2d 994, certiorari applied for (May 21, 1965). Substance, rather than form, will be controlling in determining the tax effect of the transaction. *Ersel H. Beus*, 28 T.C. 1133, affd. 261 F. 2d 176; *Truman Bowen*, 12 T.C. 446. The passage of legal title alone, in the technical sense, does not determine when a taxpayer's holding period with respect to real property ends for purposes of this

statute.  *Ted F. Merrill*, 40 T.C. 66, affirmed per curiam 336 F. 2d 771. We must look to the intent of the parties in terms of what they intended to happen.  For a general discussion of this rule, see *Oesterreich* v. *Commissioner*, 226 F. 2d 798.  We should be concerned more with the practical effect of the transaction rather than with the technical effect of it.  If we find from all the facts and surrounding circumstances that the parties intended the agreement to result in a sale of the property and it transfers substantially all of the accouterments of ownership, the transaction will be treated as a sale rather than a lease even though the parties intended that legal title to the property should not pass until the 6 months' holding period had expired.

Applying the above principles to the facts and circumstances in this case, we have little difficulty in determining that the parties intended the agreement to result in a sale of the property from the corporation or its stockholders to the State and that the primary reason for casting the agreement in the form of a lease with option to purchase was to delay the passage of legal title until the 6 months' holding period, which would produce long-term capital gain, had expired.

The State was interested in acquiring the property for its own use, not just leasing it.  The chancellor's opinion in the State court proceeding to nullify the transaction included the following observation:

Insofar as the State was concerned it is a fair inference that it intended from the beginning to acquire the hotel property by purchase rather than by lease. * * *

And:

The record shows without contradiction that the beneficial owners of the lessor corporation insisted upon the lease agreement for a period of at least six months so that they would be in a position to minimize the income tax which had to be paid on the profit, in the event the option was exercised and the property was sold to them.

The evidence presented in this case supports the above conclusion.  The agreement itself expressly shows that the State officials considered themselves to be acting pursuant to Tennessee Code section 3166.1, a provision authorizing purchase of property by the State.  The purchase price under the option was exactly the same as the total rental that would be paid over the full 15-year term of the lease if the option was not exercised, it was to be paid over the same period of time, and with the same monthly payments; and it was provided that if the option was exercised all prior "rental" payments would be applied to reduce the purchase price.  In fact, in reporting this transaction on the fiduciary return for the year 1952, the trustee treated all payments received during the year 1952 as installment payments on the purchase price.[6]

---

[6] If the agreement was in reality a lease until the option was exercised, it would appear that all amounts received as "rental" prior to December 1952 should have been reported as rental income taxable at ordinary income rates.

742

The State acquired substantially all of the benefits and burdens of ownership under the agreement, except the bare legal title; and this the State had the nonforfeitable right to acquire by exercising the option. There was no logical or economic reason for the State not to exercise the option—it would have to pay the full purchase price as rental if it did not. It also expended a large sum of money in renovating the building for its own purposes prior to the time it took possession.

The lease was not terminable unless a party was in default. The State was to pay for the insurance on the property and was responsible for keeping the property in good repair; it also indemnified the lessor against all taxes levied against the property or the rentals therefrom. The State was also entitled to receive all rentals from the property (from other tenants still in possession) on and after January 1, 1952. A form of deed for transfer of title if the option was exercised was attached to the lease-option agreement and it even appears from the photostatic copy of the instrument offered in evidence that the State officials signed the deed form attached to the agreement, although it was not signed by the lessors and a slightly different deed was actually executed by all the parties after the option was exercised. And while no evidence was offered to show what portion of the total value of the property was attributable to the building for depreciation purposes, it is obvious that with each monthly payment under the agreement the State was acquiring an equity in the property. See *D. M. Haggard*, 24 T.C. 1124, affirmed per curiam 241 F. 2d 288; *Chicago Stoker Corporation*, 14 T.C. 441; *Judson Mills*, 11 T.C. 25. But cf. *Benton* v. *Commissioner*, 197 F. 2d 745, reversing a Memorandum Opinion of this Court.

We conclude from all the evidence that the lease-option agreement was in reality an installment sale contract and consequently that petitioners' holding period of the property terminated not later than January 1, 1952.

But in deciding this issue it is also necessary to determine when petitioner's holding period began. Petitioner did not actually acquire any interest in the property personally until the corporation was liquidated and the property was conveyed to the liquidating trustee for the benefit of the stockholders by deed dated on or about December 29, 1951.[7] However, the corporation was liquidated pursuant to the provisions of section 112(b)(7) of the 1939 Code and petitioner executed and filed an election to be taxed under that section. It is possible that through the interplay of sections 112(b)(7), 113(a)(18), and 117(h) petitioner's holding period for the property he received in the liquidation of the corporation (the hotel property and other

[7] This deed was not offered in evidence but it is recited in the trust agreement of Dec. 29, 1951, that such a deed had been executed and delivered.

assets of the corporation) would include the period for which he held the property exchanged (his stock in the corporation), thus initiating his holding period of the hotel property on the date he received his stock in the corporation.

It was stipulated in the original stipulation of facts that the corporation was formed on June 18, 1951; however it appeared from exhibits introduced into evidence, particularly the opinion of the chancellor in the State court proceedings to have the transaction set aside, that the corporation was formed on July 18, 1951. Thinking that this 1-month discrepancy might be crucial in determining whether the property was held by petitioner for more than 6 months, the Court requested the parties to stipulate the actual date of incorporation and the date petitioner acquired his stock. By supplemental stipulation the parties have agreed that the corporation was formed on July 18, 1951, and the stock was issued sometime after that. This makes unnecessary a determination of whether petitioner's holding period of the hotel property he sold on January 1, 1952, started with the date he acquired the property, the date he acquired the stock, or the date the corporation acquired the property, because all of those dates would be less than 6 months prior to the date his holding period terminated. We therefore conclude that petitioner realized short-term capital gain on the sale of the hotel property.

*Issue 2. Deductibility of Taxes, Attorneys' and Accountants' Fees*

The trust, for the taxable years in question, computed ordinary distributable losses in the amounts of $58,264.79 and $43,429.98 for the years 1952 and 1953, respectively. Petitioner deducted his pro rata share of these losses in the returns filed for those 2 years. Respondent disallowed two items that were included by the trust as expenses in computing the ordinary distributable losses. One item disallowed was taxes, in the amounts of $7,329.20 and $11,857.78 for 1952 and 1953, respectively. The other item disallowed was attorneys' and accountants' fees, in the amounts of $21,000 and $6,101.30 for 1952 and 1953, respectively. Petitioner's income was therefore increased in the amounts of $9,443.06 and $5,986.36 (representing his one-third share of the losses disallowed) for the respective taxable years.

In his notice of deficiency respondent stated that the $21,000 in attorneys' fees and accountants' fees disallowed for 1952 were liabilities of Cumberland Properties, Inc., assumed by the stockholders on liquidation and it was therefore added to their basis for computing gain on the sale of the property. No reason was given for disallowance of the amounts claimed for taxes in 1952 and 1953 and for attorneys' fees in 1953 except that they were disallowed because it had

744

not been shown that such deductions were allowable under section 23 of the 1939 Code.

The burden of proof was on petitioner to show that respondent was in error in disallowing these deductions, but he failed to offer any competent proof supporting the deductions and the issue was not developed extensively by either party on brief. Our examination of the accounting made by the liquidating trustee, which was received in evidence, indicates that two checks were drawn on the trustee account in December 1952 totaling $7,329.20 in payment of 1952 State, county, and city taxes on the Memorial Hotel property, which is the amount claimed as a deduction for taxes for the year 1952, but we cannot specifically identify the disbursements claimed for taxes and attorneys' fees claimed for the year 1953. Furthermore, by subsequent entries in the trustee's income cash account on September 15, 1953, it would appear that at least one of the checks drawn for payment of taxes in December 1952 had not been cashed and that there might be some question, in view of the interest of the State of Tennessee in the property, that it was subject to property taxes. We do not know why respondent disallowed petitioners their pro rata share of these expenses, but petitioners have given us nothing upon which to determine that respondent was in error in doing so. Consequently, even though we can identify on the trustee's report what appear to be payments of taxes in the amounts claimed on the return for 1952, we must hold for respondent on this issue for failure on the part of petitioner to overcome the presumptive correctness of respondent's determination.

*Issue 3. Travel Expense*

The question presented here is whether petitioners are entitled to a deduction for travel and other expenses (erroneously claimed as a "net operating loss" on the return filed) for the year 1952. The question is primarily one of fact, and of course the burden is on petitioner to prove that he is entitled to a deduction. The only evidence presented was petitioner's testimony that he took a certain number of trips during the year to various locations on business for the various corporations, syndicates, and partnerships he owned or participated in and that it cost him an estimated flat amount per trip. There was no testimony, however, as to the approximate date of any trip, the organization benefited by the travel, the purpose or reason for the trip, or the specific work performed. Petitioner has not only failed to establish the amounts spent on these trips but has also failed to establish by competent evidence that whatever trips were taken served any legitimate business purpose of his, as opposed to the organizations he purportedly made them for, or that they were ordinary and necessary expenses of his business. Therefore, even an approximation, if one could be made

on the evidence presented, as provided for by *Cohan* v. *Commissioner*, 39 F. 2d 540, cannot properly be utilized. We must sustain respondent on this issue.

### *Issue 4. Addition to Tax*

The final issue is whether petitioners are liable for the additions to tax imposed by section 294 (d) (1) (A)[8] for failure to file estimated tax returns for the years 1951 and 1952.

The addition to tax is mandatory unless petitioners show that their failure to file declarations of estimated tax was due to reasonable cause and not willful neglect. *Rene R. Bouche*, 18 T.C. 144.

Petitioners do not deny that they failed to file the declarations. The only evidence offered by petitioners on this issue was petitioner's testimony that this was about the time declarations were first required to be filed, that he had never filed one up until that time, and that he guessed he had just not realized that the declarations were required to be filed. Without more, we do not consider this a showing of reasonable cause for failure to file, and we must hold for respondent on this issue. See *John T. Potter*, 27 T.C. 200.

*Decision will be entered under Rule 50.*

---

[8] SEC. 294(d)(1). FAILURE TO FILE DECLARATION OR PAY INSTALLMENT OF ESTIMATED TAX.—
(A) Failure to File Declaration.—In the case of a failure to make and file a declaration of estimated tax within the time prescribed, unless such failure is shown to the satisfaction of the Commissioner to be due to reasonable cause and not to willful neglect, there shall be added to the tax 5 per centum of each installment due but unpaid, and in addition, with respect to each such installment due but unpaid, 1 per centum of the unpaid amount thereof for each month (except the first) or fraction thereof during which such amount remains unpaid. * * *