SUN OIL COMPANY, Transferee, SUNRAY DX OIL COMPANY and Subsidiaries, Transferor, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Sun Oil Co. v. Commissioner
Docket No. 877-73.
United States Tax Court
T.C. Memo 1976-40; 1976 Tax Ct. Memo LEXIS 363; 35 T.C.M. (CCH) 173; T.C.M. (RIA) 760040; February 17, 1976, Filed Buford P. Berry and Michael J. Henry, for the petitioner. Tom G. Parrott, for the respondent. FAY
MEMORANDUM FINDINGS OF FACT AND OPINION FAY, Judge: Respondent determined the following deficiencies in the Federal income tax of Sunray DX Oil Company and its subsidiaries, and notified petitioner that it was liable for the deficiencies as transferee of the assets of the said corporations: TYE
Deficiency
December 31, 1965
$ 14,055
December 31, 1966
47,806
December 31, 1967
95,733
October 25, 1968
217,343
We are to decide if amounts paid by Sunray DX Oil Company to the General Electric Pension Trust during the years in issue were rentals deductible under section 162(a), Internal Revenue Code of 1954. [1]
FINDINGS OF FACT Incorporated in these findings are the stipulations of facts and appended exhibits. Petitioner, Sun Oil Company, is a corporation organized and existing under the laws of the Commonwealth of Pennsylvania wherein was located petitioner's *365 principal place of business when the petition herein was filed. Petitioner acknowledges that it is the transferee of the assets of Sunray DX Oil Company (Sunray) and its subsidiaries within the meaning of section 6901(a)(1)(A)(i). [2]
During the years in issue, Sunray was an integrated oil company, engaged in the acquisition, exploration, development and operation of oil and gas properties and the production, refining, transporting and marketing of petroleum and petroleum *366 products. Together with its subsidiaries Sunray filed consolidated corporation income tax returns with the District Director of Internal Revenue, Oklahoma City, Oklahoma, for 1965 and 1966 and with the Internal Revenue Service Center, Austin, Texas, for 1967 and the taxable year ended October 25, 1968. The General Electric Pension Trust (Trust) is a fiduciary trust to which the General Electric Company and its affiliates contribute funds pursuant to plans of deferred compensation which qualify the Trust for exemption from Federal income taxation under sections 401 and 501. On or about October 13, 1964, Sunray and the Trust executed a document hereafter referred to as the first letter agreement. Under its terms Sunray was to convey to the Trust, in fee simple absolute, the land underlying approximately 120 marketing facility properties, mostly unimproved, located in Sunray's 17-state marketing area. In consideration of the conveyance of these properties, the Trust agreed to pay Sunray an amount equal to the cost incurred by Sunray in acquiring them, although in no event was the aggregate consideration paid for the properties to exceed $6 million. Sunray agreed to sell the properties *367 at cost because, with one exception, they had been purchased at different times within the preceding year and a half; and it was therefore felt that their cost to Sunray approximated their fair market value. Sunray's purpose in effecting these transactions was to improve its liquidity posture. The first letter agreement provided that the Trust would lease the several properties purchased by it to Sunray for a primary term of 25 years with options to renew for up to 65 years. The rentals were fixed so that over the primary term the price paid for the properties by the Trust would be fully recovered and a return of 4-5/8 percent per annum realized. If Sunray were to exercise all the options to renew, the Trust would realize a return of approximately 5-1/2 percent per annum on its investment over the term of the lease as extended. Three leases were executed pursuant to the first letter agreement: one on May 3, 1965, one on May 13, 1965, and one on November 23, 1965. The format of these leases which covered 81, 7 and 44 marketing facility properties, respectively, was similar in its essentials to that of a large number of leases which Sunray had entered into with respect to marketing *368 facility properties sold to numerous investors other than the Trust. Each lease afforded Sunray an option to purchase any of the leased properties on specified dates, provided Sunray had discontinued or would discontinue the then business use of the property to be purchased. In each instance the price to be paid for the property was to equal its "fair appraised value * * * to Lessor." The appraisal of the property was to be conducted by three appraisers: one chosen by the lessor, one chosen by the lessee, and one chosen by the other two appraisers. The decision of any two appraisers was to be conclusive. Sunray required that it be able to terminate its obligations to lease any property that might prove uneconomical to operate as a service station. Each lease was therefore made to provide: During the Primary Term of this Lease, Lessee may, if Lessee intends to discontinue or has discontinued the use of the Leased Premises for its then business use, make a rejectable offer to purchase the Leased Premises as of any Basic Rent payment date occurring in the Primary Term at a price in cash equal to the sum of the present values * * * of all quarterly Basic Rent payments to become due *369 on and after the proposed purchase date * * * [3]
plus an amount sufficient to insure the Trust of a return of 5 percent per annum over the term of the investment. Each lease further provided that if on any one of several specified dates * * * Lessee, in the sole exercise of its business judgment, determines that the continued leasing of the Leased Premises has become unprofitable or unreasonable or unnecessary in the conduct of its business use, Lessee may make a rejectable offer to purchase * * *. Offers to purchase made pursuant to this clause were to be identical to those offers that might have been made by Sunray had it discontinued the then business use of the property. The Trust was given 30 days in which to consider any rejectable offer that might be made and was nowise obligated to accept such an offer. In the event such an offer were rejected, however, Sunray would *370 be released from its obligation to lease the property which it had offered to purchase. Each lease further provided: In lieu of making any rejectable offer to purchase the Leased Premises permitted * * * under this Lease, Lessee shall have the right to substitute for the Leased Premises other property (to consist of land only) having a then value at least equal to the rejectable offer to purchase consideration which otherwise would have been applicable. * * * [4]
To enhance its liquidity further, Sunray entered into a second letter agreement with the Trust on or about April 24, 1967. Under the terms of the agreement the Trust committed itself to purchase approximately 200 marketing facility properties in Sunray's marketing area. As in the case of the first letter agreement, the purchase price was fixed at the cost to Sunray of the properties to be conveyed to the Trust. In this instance, however, the limit on the aggregate purchase price was *371 set at $11 million. Closings were scheduled for June 1967 and January 1968. Sunray agreed to lease the properties sold on terms similar to those contained in the leases executed pursuant to the first letter agreement. However, an annual return of 5-3/8 percent was to be provided for over the primary term and 6-1/3 percent over the extended term; and if a rejectable offer to repurchase were to be made during the primary term, the price to be offered would be sufficient to insure the Trust of a 5-3/4 percent return over the term of the investment. [5]
Leases covering 129 and 84 marketing facility properties were executed pursuant to the second letter agreement on June 19, 1967, and February 28, 1968, respectively. [6]
As of July 15, 1974, over 130 rejectable offers were made to purchase properties which it was decided would not be used for business *372 purposes. Each of these offers was accepted by the Trust. Statutory notice of the deficiencies at issue herein was mailed on November 9, 1972. OPINION Petitioner maintains that the periodic payments which Sunray made pursuant to its agreements with the Trust constituted consideration for the use for business purposes, of the marketing facility properties which Sunray had conveyed to the Trust; and that the payments were therefore deductible under section 162(a)(3). [7]
Respondent maintains that the transactions in issue were financing devices or, in the alternative, installment sales of the marketing facility properties back to Sunray. If this were the case, Sunray would have retained an equity interest in the leased properties, disqualifying the periodic payments made pursuant *373 to the leases from being deductible under section 162(a)(3). Respondent's position assumes that if Sunray had ceased to use any leased property as a marketing facility, it would have been able to regain unencumbered title to the property by, in effect, restoring to the Trust the cost the Trust incurred in acquiring the property, plus a reasonable return in the nature of interest. Sunray would have thus been able to take advantage of appreciation in the fair market value of any leased property subsequent to its having been conveyed to the Trust. Were this the case, Sunray would have retained an equity interest in the property. Union Bank v. United States,285 F.2d 126, 128 (Ct. Cl. 1961). See also Clay B. Brown,37 T.C. 461, 484-488 (1961), affd. 325 F.2d 313 (9th Cir. 1963), affd. 380 U.S. 563 (1965). The marketing facility properties were conveyed for a price intended by Sunray, which dealt with the Trust at arm's length, to approximate their fair market value at the time of the conveyances. Each lease afforded Sunray options to reacquire any of the leased properties on several specified dates for a price equal *374 to the "fair appraised value of the Leased Premises to Lessor." Respondent maintains that the price established by this formula would be the appraised value of the property as encumbered by the Sunray leases--an amount equated by respondent with the present value of future rentals. Thus understood, the provision establishing the option price would preclude the Trust from enjoying appreciation in the value of the property subsequent to the conveyance by Sunray. In our opinion, however, the formula, based as it is upon an appraisal of the property, would secure to the Trust the benefit of such appreciation. Respondent's contention that Sunray retained an equity interest in the leased properties is not substantiated by the provisions of the lease governing the option. The leases further provided that if Sunray discontinued the use of any of the leased properties for its then business use or intended to do so, it might offer to purchase such property for a price sufficient to restore to the Trust its original investment, plus a return in the nature of interest. Similar offers to repurchase were also authorized if, on certain specified dates, Sunray determined that continued leasing of *375 the property had become unprofitable, unreasonable or unnecessary in the conduct of its business. Respondent contends that in providing for such offers, the leases preserved for Sunray an equity interest in the leased properties by providing Sunray with the means of reacquiring the properties for less than their fair appraised value. In passing upon respondent's contention we must consider the purpose of the parties to the leases in including the offers to repurchase among their provisions. Karl R. Martin,44 T.C. 731 (1965), affd. on this issue 379 F.2d 282 (6th Cir. 1967). The purpose of the parties to the leases in providing for the offers to repurchase was not to provide Sunray with the means to reacquire the leased properties. This is evidenced by the fact that the Trust was under no obligation to accept such offers as might be made. The purpose of the provision in question was to insure Sunray of a way to cancel the lease of any property which might have proven uneconomical to operate as a service station site. That the offers to purchase were provided for in the leases does not, therefore, substantiate respondent's contention that Sunray *376 retained an equity interest in the leased properties. We therefore hold that under section 162(a)(3)Sunray was entitled to deduct in full rental payments made pursuant to the leases under consideration. To reflect concessions on other issues, Decision will be entered under Rule 155.
Footnotes
1. Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954, as amended.↩
2. SEC. 6901. TRANSFERRED ASSETS. (a) Method of Collection.--The amounts of the following liabilities shall, except as hereinafter in this section provided, be assessed, paid, and collected in the same manner and subject to the same provisions and limitations as in the case of the taxes with respect to which the liabilities were incurred: (1) Income, Estate, and Gift Taxes.-- (A) Transferees.--The liability, at law or in equity, of a transferee of property-- (i) of a taxpayer in the case of a tax imposed by subtitle A (relating to income taxes), * * *
in respect of the tax imposed by subtitle A * * *↩
3. Under the leases executed pursuant to the first letter agreement, the present value of a rent payment was to be determined by discounting it from the date on which it was payable to the date on which the present value was to be determined, on the basis of an annual interest rate of 4-5/8 percent.↩
4. The right of substitution was initially included in the leases, but on August 9, 1972, the leases were amended to effect a rescission of the right of substitution. As of that time the right had not been exercised by the lessee.↩
5. Under the leases executed pursuant to the second letter agreement, the present value of a rent payment was to be determined by discounting it from the date on which it was payable to the date on which the present value was to be determined, on the basis of an annual interest rate of 5-3/8 percent.↩
6. See footnote 4 above.↩
7. SEC. 162. TRADE OR BUSINESS EXPENSES. (a) In General.--There shall be allowed as a deduction * * * (3) rentals or other payments required to be made as a condition to the continued use or possession, for purposes of the trade or business, of property * * * in which [the taxpayer] has no equity.↩