FORM BUILDERS, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Form Builders, Inc. v. Commissioner
Docket No. 37228-87
United States Tax Court
T.C. Memo 1990-75; 1990 Tax Ct. Memo LEXIS 75; 58 T.C.M. (CCH) 1415; T.C.M. (RIA) 90075; February 15, 1990
Gregory A. Robinson, for the petitioner. J. Robert Cuatto, for the respondent. KORNER
MEMORANDUM FINDINGS OF FACT AND OPINION KORNER, Judge: Respondent determined a deficiency in petitioner's Federal income tax for the taxable year ended June 30, 1984, in the amount of $ 469,749. The issues for decision are: (1) whether petitioner properly deducted $ 1,070,000 as a "distribution of funds among *76 partnership," and, if not, (2) whether petitioner is nonetheless entitled to a deduction of all or part of that amount as an ordinary and necessary business expense. For reasons of convenience, we have combined our Findings of Fact and Opinion. Some of the facts have been stipulated and are so found. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference. Petitioner, Form Builders, Inc., had its principal place of business in Mesa, Arizona, when it filed the petition in this case. Petitioner is a fiscal-year taxpayer. Its taxable year at issue ran from July 1, 1983, to June 30, 1984. Petitioner is in the business of printing business forms. It was incorporated in August 1981 by Edward "Joe" Shoen and Mark V. Shoen, who also comprised its first board of directors. The stock of petitioner was owned by Samuel J. Shoen (25 percent), Stuart M. Shoen (25 percent), and Jacqueline Y. Shoen (50 percent). Samuel J. Shoen, Stuart M. Shoen, and Jacqueline Y. Shoen (hereinafter collectively referred to as the Shoen children) are all minors whose assets are subject to the control of individual conservatorships. Samuel and Stuart are sons of Joe *77 Shoen; Jacqueline is Mark's daughter. Joe and Mark are the conservators of their children's conservatorships. They are also brothers. During the year at issue petitioner's principal client was U-Haul International, Inc. (UHI). UHI is a wholly-owned subsidiary of Amerco, Inc. (Amerco), parent corporation of the U-Haul equipment rental system. The U-Haul system was founded by Leonard S. Shoen, Joe and Mark's father. During the year at issue members of the Shoen family owned 96 percent of Amerco's stock; Joe and Mark each held approximately 11 percent. Between 1973 and 1979 Joe Shoen was employed at UHI, serving as its president for most of that period. Neither he nor Mark was an officer, director, or employee of UHI or Amerco during 1984, the year at issue. Joe's wife and Mark's father-in-law were on Amerco's board at that time. The idea to form petitioner was born out of a combination of Joe Shoen's knowledge of U-Haul operations and his discussions with others about the printing business. The U-Haul system employed very specific, complex rental forms which, because of their many parts and colors, could only be produced by specially-configured equipment. At the time, UHI *78 had found only one printer able to satisfactorily produce these forms. Joe Shoen believed that he could successfully compete against this supplier. As a result, in about December 1980, he began to assemble the printing equipment necessary to produce U-Haul forms. All equipment acquired was co-owned by his and his brother Mark's children Samuel (25 percent), Stuart (25 percent), and Jacqueline (50 percent), under the control of their conservatorships. It was after the conservatorships had acquired sufficient equipment to outfit a functioning printing facility that Joe and Mark Shoen incorporated petitioner under the laws of Arizona. On July 1, 1982, petitioner and the Shoen children entered into a self-described "partnership for the production and sale of printing." That agreement was either replaced or reformed annually, at least through July 1, 1985. The document applicable to the period at issue reads as follows: PARTNERSHIP AGREEMENT * * * By this writing the parties are evidencing their intent to enter into a partnership for the sale of printing. The parties are Samuel J. Shoen, Stuart M. Shoen, Jacqueline Y. Shoen, hereinafter referred to as Shoen, and Form Builders *79 Inc., hereinafter referred to as FBI. Shoen and FBI wish to act as partners for the sale of printing. Shoen is to provide printing machinery and sales effort, FBI is to provide personnel facilities , production costs, management, insurance and sales effort. Proceeds are to be shared as follows: GROSS SALES
FBI %
SHOEN %
$ 1.00 - 1,000,000.00
67
33
1,000,000 - 2,000,000
50
50
2,000,000 +
40
60
FBI to provide all accounting. Its accounting to be deemed correct. This agreement is to remain valid for as long as the parties mutually desire. The proportions for the sharing of gross revenues to be renegotiated when appropriate, but at least annually. * * * This agreement was signed on behalf of petitioner by Mark Shoen, its then-president. Mark Shoen also signed his daughter's name to the document, as her conservator. Joe Shoen similarly signed his sons' names. Petitioner was successful in the form printing business. It reported "gross receipts or sales" of $ 2,367,800.50 for the year at issue, all but $ 7,000 [1] of which was from UHI work. The UHI sales were brought about by the efforts of Joe and Mark Shoen. All the printing was done *80 on equipment owned by the Shoen children. Joe and Mark drew no salaries, per se, from petitioner for that year; petitioner had other salaried employees. On or about December 27, 1983, all of the issued and outstanding stock of petitioner was transferred to Dr. Arnold Herrera, a close friend of Joe and Mark Shoen. Herrera paid the Shoen children $ 33,000 for the stock, the amount of their initial capitalization of petitioner. Petitioner reported that it had unappropriated retained earnings of $ 68,503.39 as of six months prior to this sale. During the year at issue petitioner paid a total of $ 1,070,000 to the Shoen children, subject to the control of their conservatorships. Samuel received $ 267,500, Stuart received $ 267,500, and Jacqueline received $ 535,000. On its corporate income tax return petitioner deducted the $ 1,070,000 on Schedule *81 A, "Cost of Goods Sold," as a "distribution of funds among partnership." No partnership information return was filed for that year. Neither did any partnership of petitioner and the Shoen children apply for an employer identification number or maintain its own set of books. In his notice of deficiency respondent disallowed petitioner's claimed $ 1,070,000 deduction in its entirety. Over fifty years ago, in considering a different area of the tax code, the Supreme Court stated: The legal right of a taxpayer to decrease the amount of what otherwise would be his taxes, or altogether avoid them, by means which the law permits, cannot be doubted. [citations omitted] But the question for determination is whether what was done, apart from the tax motive, was the thing which the statute intended. [Gregory v. Helvering, 293 U.S. 465, 469 (1935).] The focus of that Court's enquiry is applicable to the matter before us. We must examine the parties' actions in light of the relevant statutes and thereby determine the extent to which petitioner's deduction fell within or without the applicable rules. The first issue for decision is whether a "partnership, *82 " as that term was intended in the Code, existed between petitioners and the Shoen children. Petitioner contends that a valid partnership did exist and, as a result, its questioned deduction was properly taken. In contrast, respondent asserts that the parties had no partnership recognizable under the Code and, as a result, petitioner cannot be allowed to deduct a partnership distribution. Petitioner bears the burden to prove respondent's determination erroneous. Rule 142(a). [2]
The Internal Revenue Code does not define its use of the term partnership, but rather furnishes nonexhaustive lists of what it includes and excludes. See secs. 761(a), 7701(a)(2). A trilogy of Supreme Court cases do, however, flesh out a tax definition of the term. See Commissioner v. Tower, 327 U.S. 280 (1946); *83 Lusthaus v. Commissioner, 327 U.S. 293 (1946); Commissioner v. Culbertson, 337 U.S. 733 (1949). In essence, this case law directs us to examine all the relevant facts and circumstances in order to determine whether "the parties in good faith and acting with a business purpose intended to join together in the present conduct of the enterprise." Commissioner v. Culbertson, supra at 742 (footnote ref. omitted). While we note that Joe and Mark Shoen had roles within both parties whose intentions we are directed to discern, we nonetheless view such an enquiry as appropriate and feasible. Each entity involved had a legitimate purpose: the conservatorships to oversee and protect the children's property interests and petitioner to run a business in corporate form. We see no reason not to respect their identities. See Moline Properties v. Commissioner, 319 U.S. 436 (1943). As the Supreme Court's partnership test points out, factual evidence of entities' actions provides ample basis for determining their intent. Having examined all the relevant facts and circumstances of this case, we find that no partnership existed *84 between petitioner and the Shoen children. Most notably, we find that their arrangement lacked a joint profit motive, a fundamental aspect of the "joining together in the present conduct of an enterprise" required by Culbertson. To be sure, a profit motive existed on the part of petitioner and on the part of the conservatorships. However, there was no joint profit motive. As evidenced by their written agreement, petitioner and the Shoen children purported to share gross receipts according to a percentage arrangement set at the beginning of the fiscal year. [3]A sharing of gross receipts, however, is not equivalent to a sharing of profits. See Kazdin v. Commissioner, T.C. Memo. 1969-75. Neither is there any necessary correlation between the two. A business can have very impressive gross sales and nonetheless not succeed. As further explained below, we find the parties' arrangement to be the exchange of goods and services for compensation. The facts that no partnership books were kept and no information return filed, evidencing both an internal and an external *85 lack of contemporaneous manifestation of partnership intent, further support our finding that no partnership existed. See Luna v. Commissioner, 42 T.C. 1067, 1077-1078 (1964). We hold accordingly. The second issue for decision is whether petitioner is entitled to a deduction of all or part of the $ 1,070,000 item in question as an ordinary and necessary business expense for the year at issue. Petitioner contends that business expense treatment is warranted because that amount was paid in part as a rental fee and in remainder as sales commissions. In contrast, respondent asserts that no such deduction is allowable because the statutory prerequisites to rental and compensation deductions have not been met in this case. *86 Section 162 allows a taxpayer to deduct its ordinary and necessary business expenses. Sec. 162(a). Included within that allowance are rental or lease payments and payments made as compensation for services rendered. Sec. 162(a)(1), 162(a)(3). In order to qualify for these deductions, a taxpayer must show: (1) that the payments were made for the purposes articulated in the statute, i.e., with the proper intent, sec. 162(a)(1), 162(a)(3); see also Paula Construction Co. v. Commissioner, 58 T.C. 1055, 1058 (1972), affd. per curiam 474 F.2d 1345 (5th Cir. 1973) (proper intent necessary for compensation deduction); Martin v. Commissioner, 44 T.C. 731, 741 (1965), affd. on this issue 379 F.2d 282 (6th Cir. 1967) (proper intent necessary to create lease), and (2) that the payments were reasonable in amount. Sec. 1.162-7(a), Income Tax Regs. (compensation payment must be reasonable); Limericks Inc. v. Commissioner, 165 F.2d 483, 484 (5th Cir. 1948), affg. 7 T.C. 1129 (1946) (rental payments must be reasonable). We will address each of these requirements in turn. *87 With regard to petitioner's intent, we are returned to the enquiry begun in our partnership discussion. In this context as well we are directed to discern a taxpayer's intent from all the relevant facts and circumstances. See Paula v. Commissioner, supra at 1059; Martin v. Commissioner, supra.This form of enquiry is, in essence, an attempt to elevate the substance of a transaction above its form. As stated above, we find the substance of the transaction at issue to be the provision of printing equipment and sales efforts in exchange for compensation. At their barest, the facts present a receipt by petitioner of printing equipment and sales efforts [4] and a payment by petitioner of money. Upon consideration of all the facts of this case we find a sufficient nexus to have existed between these two events to hold that the payments were intended as rents and compensation for services. We so hold. *88 It remains for determination whether petitioner's expenditures were reasonable in amount. Arm's-length transactions are generally presumed reasonable; however, no such presumption attaches to transactions between related parties. Midland Ford Tractor Co. v. Commissioner, 277 F.2d 111, 114 (8th Cir. 1960), affg. a Memorandum Opinion of this Court. We find the closer scrutiny paid to related-party transactions applicable to this case. The fact of the stock sale to Dr. Arnold Herrera during the year at issue does not affect this conclusion. Dr. Herrera was a close friend of Joe and Mark Shoen and received the stock for a price substantially below petitioner's six-month earlier reported amount of retained earnings. His purchase did not change the closer-than-arm's-length nature of the transactions. The "partnership agreement" for 1984 was made six months before Dr. Herrera acquired the stock. Applying this standard of review, we decline to accept as reasonable on its face petitioner's claimed deduction of $ 1,070,000 as the cost of the goods and services it received. *89 Nor do we consider this an instance where otherwise unreasonable rents are allowable because a lease arrangement was reasonable when executed.[5] Cf. Davis & Sons, Inc. v. Commissioner, T.C. Memo. 1981-178. The rule of Cohan v. Commissioner, 39 F.2d 540 (2d Cir. 1930), is therefore applicable to this case, as petitioner has shown that it is entitled to deductions but uncertainty exists as to their proper amounts. See Oates v. Commissioner, 316 F.2d 56 (8th Cir. 1963), affg. a Memorandum Opinion of this Court. The Cohan rule charges this Court with the role of approximating as closely as possible petitioner's fair rental and sales commission expenses, and entiles us to bear heavily "upon the taxpayer whose inexactitude is of his own making." Cohan v. Commissioner, supra at 544. *90 The record in this case is woefully deficient in providing clear underlying facts upon which to base ultimate findings concerning a fair return on the rented equipment, and a fair rate of commissions on sales. With regard to petitioner's fair rental expense, the parties each offered one expert witness report accepted by this Court. The two reports reached very different conclusions, and we find neither one to be without deficiency. Having considered both reports, as well as the expert testimony and rebuttal witnesses presented, and bearing in mind the principles of approximation set forth in Cohan, we reach the following conclusions: * Both reports employ a formula that determines rental value by multiplying a value of the equipment by a periodic lease rate. We accept this general formula as our framework. * Respondent determined the total fair market value of the equipment to be $ 555,050. Petitioner determined the replacement value of the equipment to be $ 1,475,484. Both sides raised doubts about the other's valuation. We approximate the proper value, based upon fair market value, to be $ 1,100,000. * Respondent employed a yearly lease rate of 12.33 percent, based *91 upon an assumed prime rate of interest. Petitioner used monthly lease rates of 2.86 percent, 1.98 percent, and 2.14 percent, applied to different pieces of equipment. At trial petitioner established that respondent's report had used an improper amount as the applicable prime rate, and that respondent's yearly lease rate should be 15.43 percent. We approximate the proper lease rate for all the equipment to be 19 percent per year, or approximately 1.58 percent per month. * Three pieces of equipment were at petitioner's premises for only part of the year at issue. Accordingly, under the formula stated above, we approximate that petitioner is entitled to a full year's rental deduction for $ 895,746.68 worth of equipment; a four-month rental deduction for $ 45,178.40 worth of equipment; a two-month rental deduction for $ 86,014.15 worth of equipment; and a one-month rental deduction for $ 73,060.77 worth of equipment. With regard to sales commissions, only petitioner offered expert testimony. Respondent, in contrast, argues that a deduction for sales commissions is inappropriate to the transaction at issue. As stated above, we find that petitioner did receive the benefits of sales *92 efforts from Joe and Mark Shoen, and is entitled to deduct a fair amount paid therefor. However, we do agree with respondent's argument to the extent that we recognize that the sales efforts received by petitioner, like its relationship with its primary client, were atypical. Having considered petitioner's expert testimony as well as all the facts and circumstances of this case and once again bearing in mind the principles of Cohan, we approximate petitioner's fair sales commission expense to be 5 percent of the portion of its reported gross sales attributable to UHI work. Petitioner failed to establish that it received any independently compensable sales efforts with regard to its non-UHI work. The trial of this case took about five days, and the record is clogged with testimony, both lay and expert, of dubious worth. We are clear that petitioner and the Shoen children neither had nor truly intended to have a partnership; petitioner's claimed deduction for a partnership distribution must be disallowed. We are satisfied, however, that petitioner received the benefits of the sales efforts of Joe and Mark Shoen, and of the equipment rented to it, and is entitled to deductions *93 under section 162(a) for fair compensation for those items, computed in the manner we have set forth above. To reflect the foregoing, Decision will be entered under Rule 155. Footnotes
1. Petitioner's witness testified that petitioner had non-UHI sales of $ 6,000 "or a little more" during the year at issue. In light of the role this amount will play in recalculating petitioner's deficiency vis-a-vis its burden of proof and our application of the Cohan rule infra↩, we have rounded this figure to $ 7,000.
2. All statutory references are to the Internal Revenue Code, as in effect for the year in issue, and all rule references are to the Tax Court Rules of Practice and Procedure, except as otherwise noted.↩
3. The Shoen children in fact received a greater percentage of petitioner's reported gross sales than they were entitled to under the agreement, and no evidence was presented of any reformation of that agreement applicable to the period at issue. As a result, we find that agreement not to be reflective of the arrangement between the parties, although they did share gross receipts.↩
4. We recognize that it was Joe and Mark Shoen who provided the sales efforts and the conservatorships, on behalf of the Shoen children, that received the compensation. We also recognize that the parties' written agreement stated that sales efforts would be provided both by the Shoen children and by petitioner. We find, however, that a resolution of the question of exactly what capacities Joe and Mark Shoen were acting in when providing these services is beyond what is necessary for a determination of the issues for decision in this case.↩
5. As noted in footnote 3, the $ 1,070,000 received by the Shoen children exceeded the percentage of petitioner's reported gross sales that they were entitled to under the purportedly governing agreement. This fact further weakens any argument either that the $ 1,070,000 should be respected as facially reasonable or that the agreement should be upheld as controlling and arm's length.↩