YELLOW CAB AND CAR RENTAL CO. OF GULFPORT, MISS., INC., [1] Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent Yellow Cab & Car Rental Co. v. Commissioner
Docket Nos. 7662-71, 7668-71, 7674-71, 7745-71.
United States Tax Court
T.C. Memo 1974-79; 1974 Tax Ct. Memo LEXIS 242; 33 T.C.M. (CCH) 413; T.C.M. (RIA) 74079; March 28, 1974, Filed. Floyd J. Logan, for the petitioners. J. Leon Fetzer, for the respondent. DRENNEN
MEMORANDUM FINDINGS OF FACT AND OPINION DRENNEN, Judge: In these consolidated cases respondent determined deficiencies in the petitioners' income tax as follows: Additions to tax Docket No.
Petitioner
Year ending Sept. 30,
DeficiencyHsec.6651(a)
sec.6653(a)
sec.6653(b)
7662-71
Yellow Cab and Car Rental Co. of Gulfport, Miss., Inc.
1964
$31,173.61
--
$1,558.68
--
1966
39,548.62
--
1,977.43
--
1967
16,083.83
--
804.19
--
Nov. 30,
7668-71
Yellow Cab and U-Drive-It Co., Inc.
1960
22,041.75
5,510.44
1,102.09
--
Dec. 31,
7674-71
52 Taxi Service, Inc.
1964
3,750.00
937.50
187.50
--
7745-71
Earl A. Owen and Gertrude F. Owen
1963
32,075.44
--
--
16,037.72
1964
17,947.07
--
--
8,973.54
1965
17,001.41
--
--
8,500.70
1966
26,500.79
--
--
13,250.40
1967
11,709.70
--
--
5,854.85
*244 The major issues presented are: (1) Whether the individual petitioners diverted funds from one of their wholly-owned corporations (Yellow Cab and Car Rental of Gulfport, Miss., Inc.) and failed to report these diverted funds as income in their tax returns for the years 1963 through 1967; (2) whether the failure of the individual petitioners to report all of their taxable income for the years 1963-1967 was due to fraud with intent to evade tax so that they are liable for the additions to tax for fraud under section 6653(b), I.R.C. 1954, [2] and assessment and collection of any delinquency in their income tax for the year 1963 is not barred by the statute of limitations under section 6501(a) and (c) (1) (the years 1964-1967 are open on waivers); (3) whether the individual petitioners can include in their medical expense deduction computation under section 213, certain unreimbursed medical expenses which they paid on behalf of petitioner-wife's mother; (4) whether Yellow Cab and Car Rental Co. of Gulfport, Miss., Inc., is liable for deficiencies for the fiscal years ending September 30, 1966, and September 30, 1967; (5) whether Yellow Cab and Car Rental has any *245 net operating loss carryover to the fiscal years ending September 30, 1966, and September 30, 1967; (6) whether 52 Taxi Service, Inc., properly elected to report the sale of its assets in 1964 on the installment method under section 453; (7) whether Yellow Cab and U-Drive-It Co., Inc., Pensacola, Fla., sold its assets to K. C. Fillingame in 1960 or whether it merely agreed to a lease with the option to purchase in that year; (8) whether Yellow Cab and Car Rental of Gulfport, 52 Taxi Service, Inc., and Yellow Cab and U-Drive-It Co., Inc., are liable for additions to tax for negligence under section 6653(a); and (9) whether 52 Taxi Service, Inc., and Yellow Cab and U-Drive-It Co., Inc., are liable for additions to tax for being delinquent under section 6651(a). FINDINGS OF FACT Certain facts have been stipulated and are found accordingly. The petitioners in docket No. 7745-71, Earl A. Owen and Gertrude F. Owen, are husband and wife. They were residents of Gulfport, Miss., at the time this petition was filed. The petitioners timely filed their joint individual income tax returns *246 for the calendar years 1963 through 1967 with the internal revenue service for the district of Mississippi. Yellow Cab and Car Rental Co. of Gulfport, Miss., Inc. (sometimes hereinafter referred to as Cab Co.), petitioner in docket No. 7662-71, had its principal place of business in Gulfport, Miss., on the date its petition was filed. Yellow Cab of Gulfport timely filed U.S. corporation income tax returns for the fiscal years ending September 30, 1964, September 30, 1966, and September 30, 1967, with the internal revenue service for the district of Mississippi. Yellow Cab and U-Drive-It Co., Inc. (sometimes hereinafter referred to as U-Drive-It), petitioner in docket No. 7668-71, had its principal place of business in Gulfport, Miss., at the time it filed this petition. It is not clear from the record whether U-Drive-It filed a U.S. corporation income tax return for the tax year ending November 30, 1960. 52 Taxi Service, Inc. (sometimes hereinafter referred to as 52 Taxi), petitioner in docket No. 7674-71, had its principal place of business in Gulfport, Miss., on the date this petition was filed. It is not clear from the record whether 52 Taxi filed a U.S. corporation *247 income tax return for the taxable year ending December 31, 1964. The genesis of these cases was the initiation of an inquiry into the rather complex business activities of Earl and Gertrude Owen by the Internal Revenue Service. Earl and Gertrude were married in 1937. They were industrious people, and they both worked long hours in an effort to save enough money to purchase their own business. In May 1941, Earl entered the taxicab business in a partnership with W. L. Glass. This business was known as the Yellow Cab Co. of Biloxi, Miss. Petitioner Owen retained this partnership interest in this taxicab company until May 23, 1946, when the business was sold. Subsequently, in 1946 Earl Owen purchased the Yellow Cab Co. of Gulfport, Miss. Yellow Cab of Gulfport was a corporation when petitioner Owen purchased it, and he continued to run the business in corporate form. Initially, Yellow Cab of Gulfport was simply a taxicab business; however, in approximately 1948 a car rental business was added. Furthermore, when the Gulfport Municipal Airport was opened in the early 1950's, Yellow Cab of Gulfport obtained a contract for limousine service with Southern Airways to transport *248 passengers. The corporation also obtained a contract for mail and airmail delivery. In August 1965, Owen sold the taxi and limousine services but continued to operate the car rental business. He repurchased the limousine and taxi businesses in November 1967. Upon audit of the tax returns of Earl and Gertrude Owen, the Commissioner determined that the petitioners' taxable income was not adequately reflected on the returns or in their records. Consequently, the Commissioner reconstructed Earl and Gertrude's income for the years 1962 through 1967 by the net worth and nondeductible expenditures method. Respondent determined that the increases in the individual petitioners' net worth each year from the end of 1962 through 1967 stemmed from funds they had diverted from Yellow Cab of Gulfport by skimming the cash receipts of the company for their own use. Respondent also determined that these diverted funds were not included in income reported by the Cab Co., but were taxable income to it. Cab Co. had approximately 15 cabs and between 30 and 40 drivers from approximately 1960 until the business was sold in 1965. A radio dispatcher received calls for cabs and dispatched cabs *249 by radio from his station at the Cab Co. office. The drivers were generally divided into two shifts of 11 or 12 hours; however, some of the drivers were part time and worked whenever they could for 2, 3, or 4 hours. The drivers usually were assigned the same cab. At the beginning of their shift, each driver was given a trip record by either the dispatcher on duty or the manager, Gilbert Wright.The dispatcher on duty kept a radio log which recorded the zone and fare for each trip by the taxi drivers. At the end of the shifts of each driver, the dispatcher's log was compared with the driver's trip log. Some drivers failed to maintain such logs. On the basis of these logs, the drivers would retain their percentage of the gross receipts and pay the balance of their cash receipts to the dispatcher or manager. The corporation's share of the receipts was placed in a cash box and locked in a filing cabinet. The airport limousine service operation resulted from a contract with Southern Airways to transport passengers arriving at the Gulfport Municipal Airport. The passengers were charged a set amount which was paid to the drivers. These drivers would check in with the dispatcher or *250 manager in a manner similar to the taxi drivers except all the cash receipts were turned in at the end of each day. The limousine drivers were paid a commission based on the total trips of all the drivers for the week and divided equally among the drivers. The drivers were paid once a week, and the balance of the receipts was placed in the locked filing cabinet and made a part of the bank deposit prepared on Monday morning. The Hertz-Rent-A-Car business was conducted from 1963 through 1967. This operation had two to three employees at the Gulfport Airport to check out and service the rental autos. A contract was prepared with each car rental transaction. The contracts stated the rental rate for the rental vehicle and the speedometer mileage of the vehicle before and after the rental. Between 80 and 90 percent of the rental transactions were handled through credit cards. Yellow Cab of Gulfport would receive payments on the credit card charges in the form of monthly checks from the credit card companies. The cash receipts from the car rental business were added to the daily tabulation of the taxicab receipts. During the years in question both Earl and Gertrude actively participated *251 in running Cab Co. Gertrude Owen usually prepared the deposit slips depositing the cash of Cab Co. into the bank during the years in issue. When she did not prepare these slips, Earl usually prepared them. Gilbert Wright prepared the deposit slip only in a few instances. Three deposit slips for the cash receipts were prepared daily, one for a special checking account, one for the regular checking account, and one for the license tag account. Funds for fixed expenses such as gasoline, tires, insurance, and sales taxes were deposited into the special account. The license tag account was maintained as a reserve to meet the cost of the following years' automobile licenses. The regular checking account was to receive the balance of the cash receipts. Hazel Necaise was the bookkeeper for Cab Co. until February 1966. At that time she was replaced by Frankie Gentle. The bookkeeper would receive the drivers' trip sheets, the adding machine tapes prepared by Gertrude, and duplicates of the daily deposit slips. The books and records of petitioner Cab Co. were maintained on the cash receipts and disbursement method. The corporate income tax returns were also filed on a cash basis. *252 Earl Owen engaged in other business endeavors over the years. Earl received, at different times, rental income from an apartment, a cafe, a barber shop, and a bus station. During the years in issue, Earl also owned three other taxicab companies: 52 Taxi Service, Inc., which was liquidated in 1964; Yellow Cab and U-Drive-It Co., Inc., Pensacola, Fla., which was liquidated in 1963; and Yellow Cab and U-Drive-It Co., Inc., Hattiesburg, Miss. Yellow Cab and U-Drive-It Co., Inc., Hattiesburg, Miss., is not involved in any of the issues in this case. The facts that underlie the controversy over 52 Taxi Service, Inc., are not in dispute. Earl Owen acquired 52 Taxi sometime in 1955 or 1956. Although the business was incorporated no corporate stock was ever issued. By 1964, due to the lack of success of the business, the operation had only two or three taxicabs that were ready to be scrapped. In 1964, Earl, acting for 52 Taxi, negotiated a sale of Yellow Cab and Checker Franchises in Jackson County, along with the remaining equipment of 52 Taxi, to Jackson County Taxi Service, Inc., whose president was N. J. Dubuisson. A written sales contract was executed on November 24, 1964. *253 As consideration for this sale, Jackson County Taxi Service, Inc., by its president, Dubuisson, executed a promissory note for $15,000. Payment of this sum was to be made in installments of $200 per month commencing on January 31, 1965. Following this sale, 52 Taxi ceased to do business, and its corporate charter was suspended by the State of Mississippi on October 15, 1965, for failure to pay corporate franchise taxes. Both parties have agreed that 52 Taxi was liquidated in 1964. By October 1965, Jackson County Taxi Service, Inc., had paid only $776.36 on the $15,000 note which was payable to Earl Owen as payee. Jackson County Taxi informed Earl that it could not meet the payments and that he would have to take the business back. However, in October 1965 a new agreement was executed by Jackson County Taxi and Earl which reduced the purchase price to $10,000, to be paid at the rate of $150 per month. The purchaser made five payments of $150 per month and then defaulted. Subsequently, in 1968, Earl filed a suit to collect the balance due on the note. This suit was settled out of court. The suit and settlement occurred after the years presently in contention and have no *254 effect on our decision. Sometime in 1954, Earl acquired a taxicab operation in Pensacola Fla., for a cost of $15,000. The operation was conducted in corporate form as Yellow Cab and U-Drive-It Co. of Pensacola, Fla., Inc. In December 1959, the business was sold to two men who had been operating it for petitioner Owen. These men operated the business until February 1960 when they absconded. K. C. Fillingame, Gertrude Owen's brother, had been manager of this taxi business in Pensacola, Fla., until it was sold in 1959. Fillingame notified Earl when the purchasers absconded. Earl immediately traveled to Pensacola and met with Fillingame. Earl offered to sell the taxicab operation to Fillingame for $100,000 with the price payable at the rate of $50 per day. A written lease-purchase agreement was drawn to that effect but was never executed by the parties. However, Fillingame did agree to operate the business and to buy it if he could reduce the corporate obligations to a reasonable amount. He did conduct the taxi business and began paying $50 per day directly to the Citizens and People's Bank in Pensacola. These payments were credited against a note of the corporation which *255 was held by this bank. Approximately 1 year after taking over the operation of the business, Fillingame was unable to make the $50-per-day payments and requested that the payments be reduced to $30 per day. The bank agreed, and these payments were reduced to the $30-per-day figure. While Fillingame operated the business he purchased additional equipment in his own name. He also claimed a depreciation deduction on his 1960 tax returns for cars, and used shop equipment and radio equipment which had been purchased by Earl Owen through the corporation. Fillingame also purchased license tags for all the taxicabs during 1961 and 1962. In May 1963, Earl Owen executed a bill of sale for the taxicab business known as Yellow Cab Co. in favor of Fillingame for the sum of $25,000.This bill of sale recited that Earl Owen had transferred this taxicab business in May 1960 to K. C. Fillingame under a lease-purchase transaction. It further stated that Fillingame has exercised his option to purchase the assets of the business and paid the remaining balance due on the purchase price. Fillingam negotiated a loan for $28,000 from a bank. The sum of $10,000 of the $25,000 purchase price *256 was used to pay the corporate note, and the $15,000 balance was placed in a savings account in the name of Earl Owen. The bank required that the $15,000 in Earl's savings account be pledged as collateral for Fillingame's $28,000 note. The corporate charter of Yellow Cab and U-Drive-It Co. of Pensacola was revoked, and the corporation was dissolved on August 28, 1964, by the State of Florida for nonpayment of corporate stock taxes. Both parties agree that Yellow Cab and U-Drive-It Co., Inc., of Pensacola, Fla., was liquidated in 1963. Sometime between 1947 and 1948 James R. Fillingame and Estelle Fillingam the parents of Gertrude Owen, moved from their home in Oloh, Miss., and purchased a home in Gulfport, Miss.
After he moved to Gulfport, James had no income from 1947 until his death in 1955. During this period, James and Estelle were almost economically self-sufficient and paid their own living expenses. Gertrude may have purchased some of their groceries and paid some of their small bills. Following James' death in 1955, Estelle Fillingame moved into the home of Earl and Gertrude and lived with them until her death in December 1964. During 1963 and 1964, the Owens *257 incurred unreimbursed medical expenses for Estelle in the sums of $53.00 and $898.66, respectively. The net worth of Earl and Gertrude Owen as of December 31 of each of the years 1962-1967 and their non-deductible expenditures and other adjustments required to determine their adjusted gross income for each of the years 1963-1967 are found to be as follows: and Nondeductible Expenditures, and Computations of Assets
12-31-62
12-31-63
12-31-64
12-31-65
12-31-66
12-31-67 Cash on hand
$ 500.00
$ 500.00
$ 500.00
$ 500.00
$ 500.00
$ 500.00
Cash in banks
447.32
168.83
359.08
831.81
769.34
1,180.55
Savings accounts
4,924.73
32,219.92
61,448.72
74,213.64
47,021.39
74,361.24
Accounts receivable
Yellow Cab & Car Rental, Gulfport
81,035.68
81,781.43
81,781.43
84,281.43
140,522.05
139,298.83
Yellow Cab & U-Drive-It, Hattiesburg
0
0
0
0
0
6,000.00
Notes receivable
7,093.39
1,000.00
15,000.00
9,550.00
9,250.00
9,250.00
Stocks & bonds
97,062.50
79,587.50
64,587.50
63,162.50
55,000.00
57,700.00
Rental property
36,154.41
36,154.41
36,154.41
36,154.41
36,154.41
36,659.79
Real estate
22,533.33
22,533.33
23,733.33
24,733.33
25,230.03
41,305.02
Total Assets
249,751.86
253,945.42
283,789.47
293,427.12
314,447.58
366,255.43
Liabilities
Accounts payable
0
0
0
0
0
0
Notes payable
5,093.73
5,561.93
12,489.89
5,581.12
3,097.84
27,419.30
Accumulated depreciation
20,332.79
20,814.77
21,296.75
21,788.73
22,260.71
22,890.95
Total liabilities
$ 25,426.52
$ 26,376.70
$ 33,786.64
$ 27,359.85
$ 25,358.55
$ 50,310.25
Net Worth
224,325.34
227,568.72
250,002.83
266,067.27
289,089.03
315,945.18
Less: Net worth beginning of year
224,325.34
227,568.72
250,002.83
266,067.27
289,089.03
Increase in net worth
3,243.38
22,434.11
16,064.44
23,021.76
26,856.15
Nondeductible expenditures & other adjustments
a) Personal living expenses
8,827.59
7,500.00
9,400.00
10,088.52
9,030.00
b) Federal income taxes
483.02
493.01
1,257.80
2,146.91
1,388.08
c) Nondeductible portion of insured casualty loss
0
0
0
0
1,425.00
d) Nondeductible loss on sale of mobile home
0
0
0
0
955.60
e) Life insurance premiums paid
6,311.88
6,761.45
7,645.86
11,767.98
14,103.00
f) Capital loss not requiring funds
2,027.21
0
1,900.00
0
0
g) Dubuisson note
0
0
4,223.63
0
0
h) Interest paid by Yellow Cab of Gulfport on Earl's indebtedness
481.94
793.14
196.97
69.42
62.03
Increase in net worth plus nondeductible expenditures
21,375.02
37,981.71
40,688.70
47,094.59
53,819.86
Less: Nontaxable sources of funds
a) Losses from the sale or exchange of property
1,000.00
1,000.00
1,000.00
1,000.00
1,000.00
b) Proceeds of insurance policies
745.75
0
2,500.00
17,386.07
3,751.41
c) Dividend exclusion per return
0
0
0
50.00
30.00
Total adjusted gross income
19,629.27
36,981.71
37,188.70
28.658.52
49,038.45
Less: Adjusted gross income per return
7,193.41
11,121.66
12,024.51
11,524.24
12,500.51
Diverted funds
12,435.86
25,860.05
25,164.19
17,134.28
36,537.94
*258 The unreported income of the Owens as found above, except for insurance premiums and interest paid by Cab Co. for the benefit of the Owens, represented funds diverted from the gross receipts of Cab Co. and are taxable as additional income to Cab Co. The method of allocating this and other additional income of Cab Co. to Cab Co.'s fiscal years here involved used by respondent in the notice of deficiency is approved. Yellow Cab and U-Drive-It Co. of Pensacola, Fla., did not sell its assets to K. C. Fillingame in 1960. Earl and Gertrude Owen's income tax return for 1963 was false or fraudulent with intent to evade tax. Their underpayment of taxes for each of the years 1963-1967 was due to fraud. The underpayment of taxes by Cab Co. for the years 1966 and 1967 and by 52 Taxi for the year 1964 was due to negligence or intentional disregard of rules and regulations. The failure of 52 Taxi to file an income tax return for 1964 was not due to reasonable cause but was due to willful neglect. OPINION The deficiencies determined against all of the taxpayers herein, being Earl and Gertrude Owen and various corporations in which they had an interest, resulted from an audit *259 of the tax returns of Earl and Gertrude Owen for the years 1963-1967. Upon finding that the Owens did not have adequate records from which their correct taxable income for those years could be determined, respondent compiled a net worth statement for the Owens to check the accuracy of their returns as filed. The increase in net worth as found by respondent indicated that the Owens' income had been grossly understated on their returns, so respondent recomputed the Owens' taxable income for the years 1963-1967 on the basis of the increase in their net worth plus their nondeductible expenditures. Respondent also determined that the source of the Owens' unreported income was from diverting or skimming cash receipts of Yellow Cab of Gulfport for their own use; hence, the unreported income of the Owens was also determined to be additional income to the Cab Co. We find that respondent was justified in reconstructing the Owens' taxable income by the net worth method because, unless it is established that the apparent increase in net worth came from nontaxable sources, the Owens' tax returns for these years clearly understated their taxable income and they had no books and records adequate *260 to prove their correct taxable incomes. Holland v. United States, 348 U.S. 121 (1954); Fairchild v. United States, 240 F.2d 944 (C.A. 5, 1957); Morris Lipsitz, 21 T.C. 917 (1954); William G. Stratton, 54 T.C. 255 (1970). Earl and Gertrude Owen To justify the use of the net worth method for reconstructing the Owens' income, the respondent must have met the three requirements established by the Supreme Court in the Holland case. First, he must establish an opening net worth with reasonable certainty; second, he is required to check leads reasonably susceptible of being checked; and third, he must establish a likely source for the alleged unreported income. We find that respondent met each of these requirements. Respondent has established an opening net worth with reasonable certainty, as will be discussed later. As we understand the situation, petitioners do not rely on any nontaxable sources of income except cash on hand at the beginning of the period, cash obtained from Gertrude Owen's mother, Estelle Fillingame, cash obtained *261 by borrowing, and cash obtained by surrendering life insurance policies and converting other assets to cash, all of which respondent checked, and petitioners did not furnish respondent with any leads that were not checked. And finally, respondent has established that the Owens had a likely source for the unreported income, being the Yellow Cab Co. of Gulfport. We are convinced by the evidence that the source of the Owens' unreported income was funds diverted from the daily cash receipts of the Cab Co. which were not, but should have been, reported as additional income by the Cab Co. Most of the Cab Co. receipts were in the form of cash. The cash receipts were received by Earl or Gertrude or an employee of the Cab Co. and were then put in the safe at the Cab Co. office. From them on Earl and Gertrude had complete control of the money and were responsible for making the bank deposits. There was no one that checked on the amount of the receipts after they were placed in the safe. It would have been easy for Earl or Gertrude to remove some of the cash for their own use before making the deposit slips and to give the bookkeepers statements of receipts that corresponded with the amounts *262 deposited in the bank.Petitioners contend that the Cab Co. could not have earned so much additional income, but there is no evidence to support this assertion, and we have no way of knowing. Furthermore, Earl testified that his only source of income during those years other than the sources reported on his returns was the Cab Co. We must bear in mind that while respondent has the burden of proving fraud, the petitioners still have the burden of proving error in respondent's determinations of taxable income. Our initial task is to examine respondent's net worth computation in the light of all the evidence relevant thereto to determine first whether his opening net worth for the Owens was established with reasonable certainty. If it is so established, then the increases in petitioners' net worth during this period, plus their expenditures, make it certain that petitioners' records and income tax returns did not reflect all of their income, and we are justified in resorting to the net worth method of computing their taxable income. With regard to respondent's opening net worth, the parties *263 have stipulated the correctness of respondent's figures in the opening net worth except for cash on hand and an alleged liability for notes payable to Estelle Fillingame. As indicated in the net worth statement in our findings of fact, we have concluded that respondent's determinations with respect to those two items were reasonable and correct, for reasons hereinafter discussed. While the parties are in agreement that the asset accounts receivable by the Owens from the Cab Co. is correct in respondent's opening net worth, this case is complicated by the fact that part of the cash receipts of the Cab Co. diverted by the Owens were subsequently turned over to and used by the Cab Co. but were reflected on the Cab Co. books, not as additional income, but as loans from the Owens. These amounts were entered on the Cab Co. books as accounts payable to the Owens, and the parties have stipulated the yearend balances in this account as shown on the Cab Co. books. Respondent has included these balances as assets of the Owens in his net worth computations, thus increasing the Owens' taxable income. While we are convinced that the Owens devised this method of avoiding tax on the skimmed cash *264 receipts by both themselves and the Cab Co., we do not believe they should be taxed twice on the same income, which may be the result of respondent's computation, in part at least. We believe the more accurate way to determine the taxable income of both the Owens and the Cab Co. is to treat the Owens as mere conduits of those cash receipts of the Cab Co. that were not used by them or for their benefit. Diverted funds reflected in their assets, other than some of the accounts receivable from the Cab Co. and reflected in nondeductible expenditures, will be considered to be constructive dividends taxable to the Owens. We cannot be certain that the skimmed funds were passed through to the Cab Co. as loans in the same year they were skimmed, but a similar hazard exists in any net worth computation used to determine taxable income. With this explanation we turn to the net worth computation, bearing in mind the admonition of the Supreme Court in Holland v. United States, supra, that: an essential condition in cases of this type is the establishment, with reasonable certainty, of an opening net worth, to serve as a starting point from which to calculate future increases *265 in the taxpayer's assets. The importance of accuracy in this figure is immediately apparent, as the correctness of the result depends entirely upon the inclusion in this sum of all assets on hand at the outset. * * * As previously noted, the parties have stipulated the amounts of most of the assets and liabilities in the Owens' net worth at the beginning of the period, January 1, 1963. They have also stipulated the amounts of most of the Owens' assets and liabilities and nondeductible expenditures throughout the period here involved. The items about which there is no dispute are reflected in the net worth statement included in our findings of fact at the stipulated figures, unless otherwise indicated herein. The items about which there is a dispute appear in our net worth statement as figures with lines drawn under them, the figures inserted above the lines reflecting our conclusions as to what the correct figure for those items should be. The principal item in dispute, as is true in many net worth cases, is the amount of cash on hand at the beginning of the period. In his net worth computation respondent determined that the Owens had $500 in cash not in banks at the beginning *266 of the period and also at the end of each year involved. Petitioners contend that they had approximately $100,000 in cash on hand in a safe under the bar in their home as of December 31, 1962; and that they used this cash during the years 1963-1967 in either acquiring other assets, reducing liabilities, or for living expenses. Petitioners claimed that this cash hoard was accumulated as follows. Between them they had savings of about $3,000 when they were married in 1937. Their parents gave them $3,000 as wedding gifts. They lived frugally and saved about $50 to $100 per week thereafter until 1941, when Earl entered the taxi business in Biloxi, Miss. Due to the large number of servicemen in the area this business flourished, and Earl was able to accumulate $62,000 from the operation of this business by the time he sold it in 1946, $30,000 of which was invested in Government bonds and $32,000 of which was in cash. During the 1950's both petitioners worked in the Yellow Cab operation, putting in long hours and living frugally, and they continued their custom of saving about $50 to $100 per week. By the end of 1962 they had accumulated about $100,000 in cash which they kept in *267 their safe at home. Petitioners offered the testimony of Earl and four other witnesses to verify this cash hoard. Two of the witnesses were a brother and sister of Gertrude, one was a former manager of Yellow Cab, and the fourth was a close friend of Earl who was deeply indebted to Earl for past business favors. Each of these witnesses testified that on one or more occasions they saw large sums of money in Earl's safe or in the den where the safe was. None of them counted the money or knew precisely when they saw the money. Because of their close relationships to the Owens, the uncertainty of their testimony, and the circumstantial evidence hereinafter discussed, we cannot accept their testimony as proof that Earl had a cash hoard on hand at the end of 1962. Respondent developed a great deal of evidence tending to establish that it was quite unlikely that the Owens had a cash hoard on hand at December 31, 1962. When first asked by a revenue agent whether he had any cash not in banks other than current business receipts as of December 31, 1962, Earl replied that he may have had $500 to $600. The next time he talked with an agent he said he had cash savings of about $60,000. *268 The last time he was asked about cash on hand he told the agent he had about $100,000 in savings at home in his safe. In addition, he testified that he had borrowed $14,000 in cash from his mother-in-law, Estelle Fillingame, prior to December 31, 1962, and increased these borrowings to $59,600 prior to and after Estelle's death in December of 1964. Earl filed numerous financial statements with various financial institutions between 1956 and January 31, 1963, in which he listed little or no cash on hand other than in banks. Earl also borrowed money from financial institutions at various times during that period. When confronted with these inconsistencies, Earl testified that he did not put his savings in banks because banks did not pay interest, despite the fact that he had $4,925 in savings accounts as of December 31, 1962, and kept very sizeable amounts ($74,361 as of December 31, 1967) in savings accounts thereafter, from which he reported interest income. Earl also testified that he did not list his cash on hand on his financial statements given to lending institutions because he was afraid they would not lend him money if they knew he had cash available. Coming from a businessman, *269 this stretches our credulity - nor does it explain why he supposedly borrowed the life savings of his mother-in-law when he had idle money of his own. Looking at his investment history leads us to believe that Earl would not have let such a sizeable amount of money remain idle. Earl acknowledged that banks were a safe place to keep cash but said that his home was also safe - this despite the fact that his home had been almost completely destroyed by one hurricane prior to 1963 and damaged by another. He testified that his wife took the $100,000 in a paper bag to Hattiesburg to avoid loss from these hurricanes.
In addition we think it highly implausible that the Owens could have accumulated $100,000 in cash in addition to the other assets they had accumulated prior to 1963 on the income they received as determined from their tax returns and other evidence. The cost basis of the stipulated assets of the Owens as of December 31, 1962, was approximately $250,000, aside from cash on hand, and they had only one liability of about $5,000 in addition to the alleged debt to Estelle. Petitioners' income tax returns for the period 1952-1962 reflect a total income received by them during *270 that period of about $60,000 and itemized deductions of about $16,000. When personal living expenses and other non-deductible expenditures are added to the itemized deductions, it is apparent that petitioners would have at the most about $30,000 to invest or accumulate in cash. Based on the record as a whole, we are not convinced that the Owens had any substantial amount in a cash hoard kept at home prior to 1963. Respondent used a figure of $500 cash on hand at the beginning of the net worth period based on Earl's original statement to them. This figure for cash on hand was carried over to the beginning and ending of each year in the net worth period by respondent - thus not affecting income computed by the net worth method. Petitioners agree that the $500 figure should be used as of December 31, 1967, the end of the period. There may have been more or less cash on hand in the Owens' possession or in the Cab Co. safe at the beginning and end of each of these years, particularly when the daily undeposited receipts of the Cab Co. are considered, but the latter cash would not be an asset of the Owens, and the evidence suggests no better figure to use, so we will sustain respondent's *271 determinations with respect to cash on hand in the net worth statement for the Owens. The next disputed item in the net worth statement is accounts receivable from Yellow Cab of Gulfport. [3] This item reflects the amounts contained in an account on the books of Yellow Cab of Gulfport entitled "Loans From Stockholders - Accounts Payable Earl Owen," which in turn apparently reflected amounts of cash advanced to the corporation by Owen from time to time and treated as loans. Presumably this account was also debited with amounts of cash Owen withdrew from the corporation other than salary, etc. The parties have stipulated the adjusted balances reflected in the "Loans From Stockholders - Accounts Payable Earl Owen" on the corporate books, but petitioners would reduce these balances by the amount of premiums paid by the corporation on life insurance owned by Earl Owen. The parties have stipulated the amounts of these premiums paid by the corporation in each of the years involved and have agreed that the corporation was not entitled to a deduction for the premiums *272 paid, but they do not agree on how this affects the accounts payable/receivable account or otherwise affects the computation of petitioners' income by the net worth method. Since the corporation deducted these premium payments on its tax returns, we assume that no entry was made in the loans payable account with respect to these amounts. Thus, when it is recognized that these payments were made in behalf of Owen, they should be treated as constructive dividends to Owen which would be reflected in his income as nondeductible expenditures below the line in the net worth computation. Petitioners claim, however, that a part of the cash they deposited with the corporation and which had been treated as a loan and added to the accounts payable account, was, in reality, reimbursement to the corporation for these premiums, so the accounts payable account should be reduced by the amounts of the premiums to reverse the prior entries. Basically we agree with petitioners, but since our approach to this case is to treat the Owens as a mere conduit of the diverted corporate funds, we will ignore the increases in the accounts payable stockholders account as reflected on the corporate books and *273 will reconstruct it by adding to the opening balance in the account only those amounts advanced to the corporation by the Owens from their own funds. Our reconstruction of the accounts receivable from Yellow Cab in the Owens' net worth reflects the following balances as of the dates indicated: Year
Balance 1962
$ 81,035.68
1963
81,781.43
1964
81,781.43
1965
84,281.43
1966
140,522.05
1967
139,298.83
The increase of $745 in the year 1963 results from the proceeds of an insurance policy which Earl testified he loaned to Cab Co. The increase of $2,500 in 1965 was from a savings bond Earl cashed. And the increase of $56,240.62 in 1966 represents $17,386.07 in insurance proceeds, $11,662.50 in savings bond proceeds, and $27,192.05 of funds withdrawn from savings accounts, all of which Earl testified he loaned to Cab Co. Of course, the insurance premiums paid by Yellow Cab must be included in the Owens' income as below-the-line additions to the increase in net worth for nondeductible expenditures. Interest payments made by Yellow Cab for the Owens should also be treated the same way, except that the interest is deductible by the Owens, so there would be *274 no net adjustment in their taxable income resulting therefrom. The parties were at odds but now appear to agree on the effect on the net worth statement of petitioners' sale of 52 Taxi Co. to Dubuisson in 1964. Petitioner sold all of his interest in 52 Taxi, in which he had a cost of $15,000, to Dubuisson and took a $15,000 note in payment therefor. Dubuisson made payments of $450 on the note in 1965, but then told Owen he could not continue. Owen thereupon reduced the face amount of the note from $15,000 to $10,000; in effect incurring either a long-term capital loss of $5,000 or a loss on a nonbusiness bad debt in the amount of $5,000, which would be treated, for tax purposes, the same. Both parties agree that the $15,000 in stock should be eliminated from the Owens' net worth to be replaced by a note receivable of $15,000 in 1964, which is reduced to $9,550 at the end of 1965 and to $9,250 as of December 31, 1966 and 1967. The difference between the parties is whether an adjustment should be made below the line for this as a capital loss not requiring funds. We agree with petitioners that an adjustment should be made. The loss became a closed transaction in 1965. The *275 only other item in dispute on the net worth statement is an account payable to Estelle Fillingame. Petitioners testified that they had borrowed $14,000 from Estelle prior to 1963 and set up a liability in that amount as of December 31, 1962. Petitioners also claim they borrowed an additional $15,000 from Estelle in 1963, an additional $10,600 in 1964, and an additional $20,000 from her estate after her death in December of 1964. The total liability of $59,600 is carried across the net worth statement to December 31, 1967, at $59,600. Respondent does not recognize that petitioners obtained any funds from Estelle and does not recognize the liability. Petitioners' explanation of this item again taxes our credulity. Earl testified that Gertrude's parents, James and Estelle Fillingame, had $65,000 in cash when they moved to Gulfport in 1947; when James died in 1955, Estelle moved into the Owens' home bringing the $65,000 in cash with her in a wooden box which she kept in her dresser drawer. Earl allegedly took money from the box from time to time, leaving in its place slips of paper showing the date, the amount of the loan, and his initials. He had thus borrowed $39,500 by the *276 time of Estelle's death in December 1964. Following Estelle's death, a meeting was allegedly held in the Owens' home which was attended by Earl Owen, Gertrude Owen, their son, David Owen, and two other children of Estelle, Kary C. Fillingame and Odie Mae Summerall. All five relatives testified that when they opened the dresser drawer and box, they found $20,000 in cash and Earl's IOU's; that, despite the fact that Estelle left no will, it was their understanding that Estelle's wishes were to give David $30,000 of her savings and the rest was to go to Gertrude; and that they agreed to honor Estelle's wishes and let Earl invest the $20,000 cash in savings bonds for David, with Gertrude receiving her share by the forgiveness of Earl's indebtedness. This rather fantastic scenario lacks credibility from its inception. Even if Estelle and her husband had $65,000 in cash when he retired and they moved to Gulfport in 1947, this was apparently their only source of funds for their support, and they must have used a good bit of it for that purpose prior to 1955 when James died and Estelle moved in with the Owens. Estelle must also have drawn on these funds for her support from 1955 to *277 1964. There is no explanation of what happened to Estelle's cash during the storms that allegedly caused Gertrude to take her cash to Hattiesburg. It would also be surprising that Estelle, who had eight children, would give all of her life savings to the family of one of those children. Furthermore, Earl told the revenue agents that neither he nor Gertrude inherited any property and that all of his borrowings were from financial institutions. In all, we cannot believe the testimony with respect to Estelle's cash hoard and consequently do not recognize it either as a source of the increase in petitioners' net worth or as giving rise to liabilities of the petitioners. We believe the parties are agreed on the amount of living expenses and all other below-the-line adjustments that should be made to arrive at the Owens' taxable income. The net worth statement contained in our findings of fact sets forth our conclusions as to the Owens' adjusted gross income, and we will leave it to the parties to compute the taxable income from that base. Petitioners claimed that they were entitled to additional medical expense deductions for medical expenses they paid for Estelle Fillingame. We *278 accept petitioners' testimony on that issue but point out that if the additional expenditures were not included in the stipulated living expenses of the Owens, those amounts should be added to the below-the-line expenditures, which would more than offset any tax benefits they would receive from the increased medical expense deduction. Yellow Cab and Car Rental of Gulfport, Miss., Inc. On brief, respondent has conceded that the statute of limitations is a bar to the collection of any deficiency in tax due from Cab Co. in 1964, so we have only the fiscal years 1966 and 1967 for Cab Co. for consideration. For reasons heretofore discussed, we conclude that the gross income of Cab Co. for those years should be computed as follows. There shall be added to the income reported on its return for fiscal 1966 the prorated portion of the diverted funds for calendar years 1965 and 1966 as shown on the net worth statement included in our findings of fact, less the insurance premiums and interest payments made directly by the Cab Co. for the benefit of the Owens. This represents gross receipts of the Cab Co. for its fiscal year 1966 that were diverted by the Owens and used to increase *279 their own net worth and for nondeductible living expenditures, and were never entered on the Cab Co. books or returns. To this shall be added the prorated portion of the increase in the "Loans From Stockholders-Accounts Payable Earl Owen" account as shown on the books of the corporation for the years 1965 and 1966 less the amounts discussed above which we found were actual loans by the Owens to the Cab Co. in those years from their own funds. This represents additional gross receipts of the Cab Co. first diverted by the Owens but then passed on to Cab Co. as loans. Under the conduit theory we are using, these funds are treated as direct income of the Cab Co., and the loans are not recognized. This same procedure shall be used to compute the additional gross income of the Cab Co. for its fiscal year 1967. According to our computations the additional taxable income of Cab Co. for fiscal 1966 is $54,376.32 and for fiscal 1967 is $18,556.89. Our calculations are reflected in the footnote. [4]
*280 Petitioners claim in the alternative that if we conclude that the Owens diverted income of Cab Co. for their own use, a part of the diverted funds would not be taxable to them as constructive dividends because Cab Co. had operated at a loss for many years and had no accumulated earnings and profits from which it could pay taxable dividends, and that its current earnings and profits were not sufficient to cover the constructive dividends claimed. Respondent recognizes that this argument may be valid and in his notice of deficiency treats some of the diverted funds as determined by him as return of capital and some as capital gain. Inasmuch as Cab Co. accounted for its income on a fiscal year ending September 30, while the Owens were on a calendar year basis, respondent prorated the additional income he determined for the corporation, being the funds diverted by the Owens throughout a calendar year, as being income that the corporation would have received equally in each month of the year, thus attributing nine-twelfths of the diverted funds for the calendar year 1963, for example, to the corporation's fiscal year ending September 30, 1963, and the remaining three-twelfths to the *281 corporation's fiscal year ending September 30, 1964. We think this is a reasonable approach to the problem and approve it. While we have found less diverted funds by the Owens than did respondent, and thus less additional income for them, we find that the additional gross receipts that we have determined for Cab Co. under our approach equals the additional gross receipts for Cab Co. determined by respondent for each of the fiscal years 1963-1967. We, therefore, find that Cab Co.'s current and accumulated earnings and profits available for dividends can be computed for each of the years here involved using the procedure used by respondent, modified, however, to reflect the lesser amount of diverted funds we have attributed to the Owens than did respondent. Using respondent's figures for net income [5] of the corporation as a starting point each year and applying this to the constructive dividends we have found the Owens received in the form of diverted funds, we find that Cab Co. had enough current and accumulated earnings and profits available for dividends in each year here involved, except its fiscal year ending September 30, 1965, to make all of the constructive dividends taxable *282 in full to the Owens as ordinary income. We find that Cab Co. had only $19,750.06 in accumulated earnings that could be available for dividends in fiscal 1965, and that inasmuch as the Owens diverted $22,170.41 of corporate funds during that same period ($6,465 being three-twelfths of the funds diverted in calendar year 1964 and a $15,705.41 [6] being nine-twelfths of the funds diverted in calendar year 1965), only $19,750.06 of the constructive dividends can be taxed to the Owens as ordinary income from dividends, and the balance of $2,420.35 shall be treated as a return of capital. In their reply brief petitioners argue that although Cab Co. was a cash basis taxpayer, its earnings and profits available for distribution in any year should be reduced by unpaid taxes and additions to tax for that year, relying on Drybrough v. Commissioner, 238 F.2d 735 (C.A. 6, 1956), and Demmon v. United States, 321 F.2d 203 (C.A. 7, 1963). It is doubtful that this argument has been properly raised as an issue in this case, but in any event, this Court has specifically rejected the argument in Joseph B. Ferguson, 47 T.C. 11 (1966). *283 Another issue that must be considered in the Cab Co. case, is whether Cab Co. is entitled to a deduction in fiscal 1966 and 1967 for operating loss carryovers from 1961 and 1962, respectively. Petitioners claim that since respondent did not audit Cab Co.'s returns for the years 1961-1963, his disallowance of the operating loss carryovers as shown on the books and records of the corporation was arbitrary and capricious, and the amounts shown on its books and records must be accepted as accurate. We agree with petitioners that the operating losses shown on the corporate books for 1961 and 1962 should be recognized for purposes of the carryover. Those amounts are stipulated to be $11,027 for fiscal 1961 and $13,162 for fiscal 1962.But we do not agree that we must accept as correct the operating deficits shown on the Cab Co.'s books and returns for the fiscal years 1963-1965 when the evidence presented in this case clearly reveals that the actual gross receipts of the corporation as shown on those books and returns were grossly understated. It is apparent that if the income of Cab Co. for those years is increased by the amount of the gross receipts diverted and temporarily intercepted *284 by the Owens, the operating loss carryovers from the years 1961 and 1962 would have been absorbed prior to fiscal years 1966 and 1967. We hold for respondent on this issue. [7]
An issue raised by counsel for Cab Co. in his opening statement with regard to the apportionment of the surtax exemption was conceded by Cab Co. in the reply brief. Yellow Cab and U-Drive-It Co., Inc. Respondent determined that on May 1, 1960, petitioner Yellow Cab and U-Drive-It, Inc., sold various capital assets having a basis of $11,833 to Kary C. Fillingame for $100,000. Respondent included a gain of $88,167 in the taxable income of Yellow Cab and U-Drive-It, Inc., of Pensacola, Fla, for the fiscal year ending November 30, 1960. Petitioner Yellow Cab and U-Drive-It asserts that there was no sale in 1960 but that an oral lease-purchase agreement was entered by the parties. Petitioner claims that Fillingame did not purchase the business until May 1963 when *285 Earl executed a bill of sale for this taxicab business in favor of Fillingame. It is Yellow Cab and U-Drive-It's position that there was no sale in 1960 and, therefore, it had no additional taxable income for that year.
Whether a certain transaction is a lease with an option to purchase or a conditional sales contract depends upon the intention of the parties. M & W Gear Company v. Commissioner, 446 F.2d 841 (C.A. 7, 1971); Lockhart Leasing Company, 54 T.C. 301 (1970); Arkansas Bank and Trust Company v. United States, 224 F.Supp. 171 (W.D. Ark. 1963). We have also held that when there is a written agreement in the form of a lease with option to purchase, this Court is not bound by the form of the agreement or its characterization by the parties. Karl R. Martin, 44 T.C. 731 (1965), affirmed on this issue 379 F.2d 282 (C.A. 6, 1967). In Martin, we stated: "Substance, rather than form, will be controlling in determining the tax *286 effect of the transaction." The hybrid characteristics of this transaction between Yellow Cab and U-Drive-It and Fillingame in 1960 are readily apparent. The ambivalent and contradictory actions of the parties both during and after the transaction make it difficult to characterize this situation. However, we think that when the transaction is viewed as a whole, the parties did not intend to enter a sales agreement in 1960. It is important to note that the parties never executed a written agreement in 1960. The parties only orally agreed that Fillingame would pay $50 per day to a bank to which the corporation was indebted. We believe that Earl offered to sell the taxicab business to Fillingame in 1960 for $100,000. We also believe that Fillingame was unwilling to pay that price. It is entirely logical that Fillingame would have been hesitant to commit himself for such a large sum. Although Fillingame had managed this business for Earl in the past, he (Fillingame), was not an experienced, independent businessman. We think that in 1960, Fillingame orally agreed to run this taxi business in his own name. In payment for the right to run the business, Fillingame agreed to make *287 daily payments on the corporate note. Finally, Fillingame and Earl did leave open the question of whether Fillingame would eventually purchase the corporation. Based on our foregoing interpretation of the facts, we conclude that Fillingame ran the corporation from late 1960 until 1963 and made daily payments on a corporate note for this right. This situation should be properly characterized as a lease. Fillingame also had the option to purchase the business at a later time and he did so in May 1963. Respondent established a list of factors surrounding this transaction which allegedly establish that this transaction was an installment sale. Fillingame did claim depreciation deductions on certain assets which belonged to the corporation on his tax returns for 1960 and 1963. He also failed to claim the payments to the bank as lease expenses on his returns for the same years. Fillingame also purchased license tags for the cars during 1961 and 1962. Although these facts tend to support the installment sale argument, we do not find them persuasive. These are merely isolated factors and the true intent of the parties must be established from the entire transaction. Fillingame *288 undoubtedly erred in claiming the depreciation deductions and failing to claim the lease expenses. However, Fillingame was a novice in the role of a businessman, and it is plausible that he might make such mistakes. We believe the testimony at trial truly helped to establish the intent of the parties in 1960. Fillingame was unwilling to purchase the business. He agreed to run it and in exchange for that right he would make payments on the corporate debt. He was also given the option to purchase the business at a time he believed he could handle it. In 1960, Fillingame obtained a lease with an option to purchase which he exercised in 1963. Since there was no sale in 1960, there was no income taxable to Yellow Cab and U-Drive-It. 52 Taxi Service, Inc. 52 Taxi Service sold its assets to N. J. Dubuisson for $15,000 in 1964; the $15,000 was evidenced by a note make payable to Earl Owen which was immediately distributed to Owen in liquidation of the corporation. Respondent determined that 52 Taxi Service realized a long-term capital gain on this transaction in the amount of $15,000. Petitioner 52 Taxi Service does not deny that a capital gain in that amount was realized *289 but argues that it is entitled to report the gain on the installment basis, and since no payment was received in 1964, no gain was taxable to it in that year. Respondent agrees that no payments were received by petitioner in 1964 but contends that petitioner is taxable on the entire gain in 1964 because (1) it did not make a valid timely election to report the gain on the installment basis, and (2) it distributed the note to Owen in 1964. There is no evidence that 52 Taxi Service filed a return for 1964 or any subsequent year, but petitioner claims it made a valid election to report the gain on the installment basis in the protest it filed on June 8, 1970. We agree with respondent.
Although the courts have allowed belated elections to have gains taxed on the installment basis, see Bookwalter v. Mayer, 345 F.2d 476 (C.A. 8, 1965), John Harper, 54 T.C. 1121 (1970); John P. Reaver, 42 T.C. 72; Jolley v. United States, 246 F.Supp. 533 (D.Nev. 1965), and respondent modified his position on the subject in Rev. Rul. 65-297, 1965-2 C.B. 152, *290 they have not done so where the years in which the gain would be taxed under the installment method are barred by the statute of limitations. In John Harper, supra, we also stated that a good-faith disclosure of the sale on the taxpayer's income tax return is necessary for a valid election to be made under section 1.453-8(b), Income Tax Regs. The burden of proof is on petitioner. There is no evidence that 52 Taxi Service disclosed the sale on any tax return or that collection of the tax on installment payments, if any, is not barred by the statute of limitations. We do not find that the Jolley case supports petitioner's position that an election to report the sale on the installment basis contained in a protest filed with respondent in 1970 constitutes a valid election, nor do we find that such an election meets the requirements of the statute or the regulations. Furthermore, when 52 Taxi Service disposed of the note to Owen in 1964, it was taxable for the entire sales price under section 453(d) (1) (B). Although respondent concedes that the distribution *291 of the note was a liquidating distribution, it was not under either section 332 or 337, so section 453(d) (4) is not applicable. Fraud Respondent determined that each of the returns of the Owens for the years 1963-1967 was false or fraudulent with intent to evade tax and asserted the addition to tax for fraud under section 6653(b). Petitioners Owen deny the fraud and claim that assessment of any deficiency for the year 1963 is barred by the statute of limitations. Our finding of fact that each of these returns was false or fraudulent with intent to evade tax disposes of both of these issues.
Respondent has the burden of proving fraud by clear and convincing evidence. Sec. 7454(a), Estate of Mazzoni v. Commissioner, 451 F.2d 197 (C.A. 3, 1971); Ceflau v. Commissioner, 276 F.2d 122 (C.A. 5, 1960); C.B.C. Super Markets, Inc., 54 T.C. 882, 896 (1970). We find that he has clearly carried that burden. Respondent's implementation of the net worth method for reconstructing petitioners' income comported with the procedural safeguards established *292 by Holland v. United States, supra.Through the net worth analysis, respondent established that the Owens omitted substantial amounts of income from their tax returns for each of the years in question. Such persistent and substantial understatements of income over a period of years are persuasive evidence of a fraudulent intent to evade taxes. Estate of Mazzoni v. Commissioner, supra; Merritt v. Commissioner, 301 F.2d 484 (C.A. 5, 1962). Furthermore, we are convinced by all the evidence, circumstantial and direct, that the Owens devised the scheme of diverting or skimming funds from the gross receipts of Cab Co. and either using them for their own benefit or later passing them along to Cab Co., ostensibly as loans, in order to provide Cab Co. with operating cash in a deliberate effort to evade taxes on those diverted funds, both to themselves and the Cab Co. We assume they might subsequently withdraw the funds passed on to the Cab Co. as repayment of loans without paying tax thereon. There are also other indicia of fraud in this case. Earl and *293 other witnesses made conflicting statements to the revenue agents at various times, apparently attuning their statements to the necessities at the time for covering the unreported income. These statements were also at times inconsistent with statements filed by Earl with lending institutions. They related to cash and other assets allegedly owned or not disclosed by Earl, to the cash hoard allegedly held by Mrs. Fillingame, and to procedures used in accounting for the gross receipts of Cab Co., among others. The large increases in the net worth of the Owens during the period involved in light of their reported income and stipulated nondeductible expenditures convince us that they must have known that they were not reporting all their income, and their efforts to explain the increases with what we believe were fabricated stories of two separate cash hoards did nothing to dispel that belief. Additions to tax for negligence and delinquency Respondent determined an addition to tax under section 6653(a) against Yellow Cab of Gulfport for the years ending September 30, 1966 and 1967, against 52 Taxi Service, Inc., for 1964, and against Yellow Cab and U-Drive-It Co., Inc., for the *294 year ending November 30, 1960. We have concluded that Yellow Cab and U-Drive-It did not owe any additional tax for 1960, and, therefore, is not liable for this addition to tax. The rule is settled that under section 6653(a) petitioners have the burden of showing that an underpayment of tax was not due to negligence or intentional disregard of rules and regulations. Marcello v. Commissioner, 380 F.2d 499 (C.A. 5, 1967); James S. Reilly, 53 T.C. 8 (1969). Yellow Cab of Gulfport and 52 Taxi Service failed to offer persuasive evidence on this issue, and, consequently, they are liable for this addition to tax. Respondent also determined additions to tax under section 6651(a) against Yellow Cab and U-Drive-It for the year ending November 30, 1960, and against 52 Taxi Service for 1964. There is no addition to tax under section 6651(a) unless tax liability is established. Palm Beach Aero Corp., 17 T.C. 1169 (1952). Since we have concluded that Yellow Cab *295 and U-Drive-It was not liable for the alleged tax for 1960, it is not liable for this addition to tax. 52 Taxi Service did incur a tax liability for 1964. It had the burden of proving that its return was timely filed or that the delinquency was due to reasonable cause. C. Fink Fischer, 50 T.C. 164 (1968). Since petitioner offered no proof on this issue, the addition to tax is sustained. Decisions will be entered under Rule 155. Footnotes
1. Proceedings of the following petitioners are consolidated herewith: Yellow Cab and U-Drive-It Co., Inc., docket No. 7668-71; 52 Taxi Service, Inc., docket No. 7674-71; and Earl A. Owen and Gertrude F. Owen, docket No. 7745-71.↩
2. All section references are to the Internal Revenue Code of 1954, unless otherwise stated. ↩
3. The amount of this item in the opening net worth was taken from the books of Cab Co. and is not in dispute. ↩
4. ↩ Yellow Cab of Gulfport
FYE Sept. 30, 1966
Unreported gross receipts Funds diverted by Earl and Gertrude (less payments of interest and insurance)
1965 -
$ 20,940.56
less
196.97
interest
7,645.86
insurance
13,097.73
3/12 of 13,097.73 = $ 3,274.43
1966 -
17,134.28
less
69.42
interest
11,767.98
insurance
5,296.88
9/12 of 5,296.88 = 3,972.65
Account receivable attributable soley to Yellow Cab
1965 -
7,278.50
3/12 of 7,278.50 = 1,819.62
1966 -
37,973.05
9/12 of 37,973.05 = 28,479.78
Total unreported gross receipts
$37,546.48
Unreported taxable income - 1966
Total income/return
$258,792.53
Unreported gross receipts
37,546.48
Corrected gross receipts
296,339.01
Deductions/notice of deficiency
235,020.43
Net income
61,318.58
Additional interest deduction/Stipulation
6,942.26
Unreported taxable income
$ 54,376.32
FYE Sept. 30, 1967
Funds diverted by Earl and Gertrude (less payments of interest and insurance)
$17,134.28
less
69.42
interest
11,767.98
insurance
5,296.88
3/12 of 5,296.88 = $ 1,324.23
1967 -
36,537.94
less
69.03
interest
14,103.00
insurance
22,372.91
9/12 of 22,372.91 = 16,779.68
Account receivable attributable solely to Yellow Cab
1966 -
37,973.05
3/12 of 37,973.05 = 9,493.27
1967 -
0
0
Total unreported receipts
$27,597.18
Unreported taxable income - 1967
Total income/return
$219,418.83
Unreported gross receipts
27,597.18
Corrected gross receipts
247,016.01
Deductions/notice of deficiency
224,720.72
Net income
22,295.29
Additional interest deduction/Stipulation
3,738.40
Unreported taxable income
$ 18,556.89
5. Corrected for what appears to be a mathematical error in subtraction in Cab Co.'s fiscal year 1967 on Schedule C-1 attached to respondent's original brief. ↩
6. Computed from $25,164.19, less $4,223.63, which represents the Dubuisson note. ↩
7. See A. Raymond Jones, 25 T.C. 1100 (1956), reversed on another issue 259 F.2d 300 (C.A. 5, 1958), and H. B. Moore, 8 B.T.A. 749↩ (1927), for discussions of the burden of proof on this issue.